**STEPHEN J. ODELL, OSB # 903530**
MARTEN LAW, LLP
1050 SW Sixth Ave., Suite 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
Telefax: (503) 243-2202
E-mail: sodell@martenlaw.com

*Attorneys for Plaintiff Public Power Council*

**IRENE A. SCRUGGS, OSB # 065030**
General Counsel
Public Power Council
650 NE Holladay, Suite 810
Portland, OR 97232
Telephone: (503) 595-9779
Telefax: (503) 239-5959
E-mail: iscruggs@ppcpdx.org

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **PUBLIC POWER COUNCIL,** a non-profit organization, | Case No: |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **U.S. ARMY CORPS OF ENGINEERS**, an agency of the United States Army and Department of Defense, | |
| Defendant. | |

## INTRODUCTION

1. This case strikes at the very heart of why the Congress authorized judicial review of agency actions in enacting the Administrative Procedure Act ("APA") some 75 years ago – to ensure agencies cannot make decisions behind closed doors in a manner fundamentally inconsistent with and in disregard of their statutorily prescribed authority, without a whit of advance notice to key stakeholders, public process, or requisite environmental analysis – as

Defendant, the U.S. Army Corps of Engineers ("Corps"), has done in adopting the measure to substantially curtail hydropower operations at the Detroit Dam that this complaint challenges. More specifically, the Corps sprung its decision to adopt the measure on the unsuspecting public, including Plaintiff Public Power Council ("PPC"), who did not learn of it until well after it was already being implemented, through the Corps' posting of a news release on its website.

2.   In the news release, the Corps stated it was undertaking this substantial modification from its normal hydropower operations at Detroit Dam as one of a series of "interim measures" that it intends to implement prior to and until such time as it completes – and therefore wholly outside the bounds of – the ongoing environmental reviews it is undertaking pursuant to the Endangered Species Act ("ESA") and National Environmental Policy Act ("NEPA") to evaluate the measures it needs to adopt to comply with its obligations under the ESA for affected listed fish species.  As a result, the Corps plans to continue to implement the measure, without any opportunity for those who stand to be most directly and substantially affected by it, including the members of PPC, for at least three more years.  It is characterized as "Interim Measure No. 5" in a June 2020 revised Willamette Valley Project ("WVP") Interim Measures implementation plan.

3.   In adopting and implementing Interim Measure No. 5 then, the Corps has violated the APA, the Flood Control Acts authorizing the construction and operation of Detroit Dam, NEPA, and also acted in a manner wholly ultra vires and fundamentally inconsistent with its previous practice as well as certain of the positions it has espoused in this Court in *Northwest Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, Case No.: 3:18-cv-00437-HZ (D. Or.) ("*NEDC RPA Case*").  As a result, at a minimum the Court needs to set aside Interim Measure No. 5 as ultra vires, arbitrary and capricious, and without observance of procedures required by law under the APA.

JURISDICTION, RIGHT TO JUDICIAL REVIEW, AND VENUE

4.  Plaintiffs' right to judicial review of the claims set forth in this complaint, and the attendant waiver of sovereign immunity of the United States as well as that of its instrumentalities, including the Corps, arise from the APA, 5 U.S.C. §§ 702 and 704.

5.  This Court has jurisdiction over the merits of this action under the federal-question statute, 28 U.S.C. § 1331, and to provide the necessary relief PPC seeks pursuant to 28 § 2201 (declaratory judgment) and § 2202 (injunctive relief), as well as 5 U.S.C. § 706.

6.  Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because PPC's principal place of business as well as that of certain of its members is in this District.  In addition, on information and belief, Plaintiff believes that a substantial part of the events or omissions giving rise to the claims in this case occurred in this District.  For example, the Corps maintains offices in the District and, more specifically, within the District's Portland Division. More specifically, both the headquarters of the Corps' Northwestern Division, which is responsible for executive direction, policy guidance, and oversight responsibility of all of the agency's water management functions throughout the Columbia River Basin, and the Corps' Portland District, which is responsible for the water control management and operation of all of the WVP dams, including Detroit, are located in Portland, Oregon.

PARTIES

7.  PPC is a consortium of nearly 90 consumer-owned utilities that have a statutory preference to the power generated by the federal projects comprising the Federal Columbia River Power System ("FCRPS"), which includes the 13 federal facilities that make up the WVP, one of which is the Detroit Dam.

8. The rates that PPC members pay for the power to which they are entitled are set by the Bonneville Power Administration ("BPA"), the agency which markets the power generated by the FRCPS pursuant to various statutes. *See, e.g.*, Bonneville Project Act of 1937, 16 U.S.C. §§ 832-832m; the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act"), 16 U.S.C. §§ 839-839h. Among other things, the Northwest Power Act requires BPA to set rates for its customers so as to recover the costs associated with the acquisition, conservation, and transmission of power, including the amortization of the Federal investment in the FCRPS and other costs and expenses incurred in the generation of such power, including those arising from fish and wildlife conservation and mitigation measures. 16 U.S.C. § 839e(a)(1). This means that PPC's members end up paying, through higher power rates, for fish and wildlife measures that the Corps adopts or implements at any FCRPS facilities, including Detroit Dam, whether in the form of forgone power production, as is the case with Interim Measure No. 5, or in the form of increased costs of operations and maintenance or additional capital expenditures necessary to undertake structural modifications.

9. In addition, PPC's members also are directly adversely affected by any reductions in power production at Detroit Dam because they pay for that portion of the project that was projected to serve power production upon its congressional authorization, which is on the order of 40 percent of the capital investments associated with construction of the dam. That number is fixed unless and until the Corps undertakes a further study to adjust the allocations to the respective statutory authorities served by Detroit Dam, which it has not done. All the costs related to operations and maintenance of power production at Detroit Dam are allocated to the wholesale electricity rates paid by PPC member utilities. The cost of hydroelectric generation is

largely fixed therefore and, as a result, the less power that is produced at Detroit Dam, the more it costs PPC's members per megawatt hour to purchase the output it does produce.

10.  Moreover, PPC and its members acknowledge that Detroit Dam needs to be operated consistent with the strictures of the ESA and that fish and wildlife are a statutorily authorized purpose of that project.  As a result, they have a keen interest in the adoption of measures at Detroit Dam designed to benefit and avoid jeopardizing listed fish species that will also not flout or be inconsistent with another statutorily authorized purpose of the dam, power production, and which are the most cost-effective means of doing so given that they bear such a large burden of the costs of such measures.

11.  Consequently, for the foregoing and other reasons, PPC and its members have legally cognizable interests that have been, and will continue to be, adversely affected within the meaning of article III and the APA, 5 U.S.C. § 702, for constitutional and statutory standing purposes that are being caused by and are fairly traceable to Interim Measure No. 5, and that this Court can remedy by providing appropriate relief.

12.  Defendant United States Army Corps of Engineers is an agency of the Department of Defense and U.S. Army that constructs and operates federal engineering projects throughout the United States, primarily in rivers, coasts, and wetlands.  The Corps has primary management authority over the operation and maintenance of the Detroit Dam, Reservoirs, and associated facilities on the North Fork of the Santiam River that are at issue in this case.

STATUTORY FRAMEWORK

13.  The APA waives the sovereign immunity of the United States to authorize federal courts to review and hold unlawful and set aside final agency action, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law,

5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, 5 U.S.C. § 706(2)(C); and/or without observance of procedure required by law, 5 U.S.C. § 706(2)(D).

14.  NEPA has been called the Magna Carta of American environmental law given that it constitutes "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies consider significant aspects of the environmental impacts of their proposed actions, and to ensure that agencies inform the public about the potential environmental effects of a proposed course of action and alternatives to it before they make or implement a decision.

15.  NEPA requires federal agencies to prepare an environmental impact statement ("EIS") in connection with and prior to taking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS must detail, inter alia, "the environmental impact of the proposed action" and "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(i) & (iii).  NEPA further provides that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id*. at § 4332(2)(E).

16.  NEPA's implementing regulations flesh out these statutory requirements in considerably more detail.  *See* 40 C.F.R. Parts 1500-08; 33 C.F.R. Part 230.  As an example, these regulations impose a continuing duty on agencies to prepare a supplemental environmental impact statement whenever "(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §§ 1502.9(d).

17.  Both the Ninth Circuit and this Court have ruled that a federal agency decision to carry out the terms of a biological opinion issued under section 7 of the ESA in connection with ongoing operation of federal hydropower projects triggers the procedural requirements of NEPA and that the agency must prepare an EIS to evaluate the effects of such operations.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 655 (9th Cir. 2014); *National Wildlife Fed'n v. NFMS*, 184 F. Supp. 3d 861, 933-35 (D. Or. 2016).

## FACTUAL BACKGROUND

A.   Statutory Authorization for the Construction and Operation of Detroit Dam

18.  Authorization and the mandatory statutory purposes for which the Detroit Dam is to be operated are contained in three different iterations of the Flood Control Act ("FCA") – those enacted in the years 1938, 1948, and 1950.  In the Flood Control Act of 1938, the Congress authorized several flood-control projects, including the 463-foot tall Detroit Dam, a gravity dam on the North Santiam River along the border between Marion and Linn Counties in Oregon. Pub. L. No. 75-761, 52 Stat. 1215, 1222 (1938).  More specifically, it provided such authorization by approving the general comprehensive plan for flood control, navigation, and other purposes in the Willamette River Basin as set forth in House Document Numbered 544, Seventy-fifth Congress.  H.R. Doc. No. 75-544.

19.  In H.R Doc. 75-544, the Chief of Engineers recommended that the existing navigation and flood-control projects for the Willamette River and tributaries in Oregon be modified to provide for the construction of a system of reservoirs for the regulation of stream flow in the interest of flood control, navigation, irrigation, power development, and stream

purification, substantially as proposed under the plan for initial development. H.R. Doc. No. 75-544 at 14.

20. The FCA of 1948 expressly added hydropower as an authorized project purpose at Detroit Dam. Pub. L. No. 80-858, 62 Stat. 1178 (1948).

21. The FCA of 1950, Pub. L. No. 81-516, 64 Stat. 179 (1950), modified the comprehensive plan authorized by the FCA of 1938 "substantially in accordance with the plans recommended in the report of the Chief of Engineers dated June 28, 1949, and approved in the letter dated February 1, 1950, from the Director of Bureau of the Budget for construction by the Corps of Engineers, both contained in House Document Numbered 531, Eighty-first Congress, second session." H.R. Doc. No. 81-531. Although there are multiple project authorities pertaining to development of the WVP, H.R. Doc. No. 81-531 remains the overall guiding direction for the Corps' operation of projects comprising the system and describes the fundamental authorization for operations of the WVP, including at Detroit Dam, to meet its statutorily prescribed purposes.

22. Appendix J to H.R. Doc No. 81-531 describes a system of reservoirs behind WVP dams, such as Detroit, for which hydropower is statutorily authorized and mandated and in which space is to be allocated for uses among flood storage, power storage, and dead storage. The allocated Power Storage only is to be used for power production if all flood-control is evacuated and inflow to the reservoir is inadequate to maintain firm power output, but this exclusive power storage is only necessary during what the report defined as "the critical power-production period, October through March" which is "when the flows in Columbia River are low." H.R. Doc. No. 81-531 at 2054 & 2239. During these fall and winter months, "releases and storage (within the

confining limits of flood control) <u>are determined by the power requirements</u>." *Id.* at 2239 (emphasis added).

23. The Detroit project is also one of several in the WVP classified as a "storage project" that is intended to be used for "power peaking," meaning that the Corps is to operate it to shape power generation so as to meet peak power demand in the region. Applicable congressional direction further prescribes in this regard that a fundamental purpose of the Willamette River dams for which power production is a statutorily prescribed purpose such as Detroit is to contribute, in all years, a maximum amount of continuous power to the Columbia River power system during the six-month critical power production period. See H.R. Doc. 81-531.

24. On September 1, 1953, the Portland District of the Corps issued a Reservoir Regulation Manual for the Detroit and Big Cliff Reservoirs. Among other things, this Manual set minimum levels for the Power, Flood-Control, and Conservation Pools in both reservoirs. With respect to power transmission, the manual states that, given its location, the Detroit Power Plant is most valuable in furnishing peak power. It also notes that this plant will therefore normally be operated at a relatively low load factor to meet peak demands on the integrated Northwest power system. The Manual goes on to provide that Detroit Reservoir storage between elevations 1425 and 1450 feet, Big Cliff storage, and Detroit Reservoir releases are similarly designed to serve a purely power function as long as they are regulated within the discharge capacity of Detroit power units, the downstream flow requirement, and the reregulating capacity of Big Cliff Reservoir. In its Rules Governing Power Releases, the Manual states that, in the critical period between December 1-Feburary 1, such releases are to equate to reservoir inflow except during periods of flood regulation.

25.  Water control management is "prescribed by laws initially authorizing construction of specific projects and any referenced project documents, laws specific to projects that are passed subsequent to construction, and the flood control acts and related legislation that Congress has passed that apply generally to all [Corps] reservoirs."  Engineer Regulation ("ER") 1110-2-240, Section 1-5(a).

26.  Water control manuals are required for all reservoirs and reregulation projects.  ER 1110-2-240, Section 3-1(a).  The project water control manual for each Corps reservoir project "defines rules or provides guidance for direction, operation, and management of water storage at an individual project[.]"  *Id.*  The water control manual must comply with the "objectives and provisions of authorizing legislation and supporting reports for that project[.]"  *Id.* at 3-1(b).  Although the Corps may adjust operations at a project it manages to more effectively address new or existing authorized purposes, any such adjustments must comply with and not stray beyond the bounds of existing statutory authorities and mandates for the project.  Moreover, in all cases, water control manuals and water control plans should be updated as necessary to reflect any authorized changes.

27.  Ordinarily, the Corps needs to manage and operate the Detroit Dam in accordance with the Water Control Manual, Water Control Plan, and Water Control Diagram in order to ensure that it stays within its statutory authorities and mandates for the Project.  The Corps has instituted several levels of process if situations should arise that result in the need for certain temporary changes (e.g., deviations) or more permanent changes to water control management.  By the Corps' own description, such processes are in place "to allow for risk informed decision-making and communication of potential operational changes with stakeholders and the public."  NEDC RPA Case, Declaration of Sean Askelson at ¶ 31 (Nov. 30, 2020)(Dkt. #132)("Askelson

Declaration"). Any deviations must be consistent with the project authorization and within existing authorities. ER 1110-2-240, Sec. 3-4.a. "An allowable deviation is a risk-informed and temporary operation consistent with the project authorization, all other applicable laws and policies, and the objectives for system and project operations." *Id.* at Appendix F-1.

28. Approval of deviations are a risk-informed decision for a temporary operation and require assessment and written documentation of the proposed operation, potential impacts, current conditions, flood threats, dam safety risks, impacts to authorized purposes, including hydropower production. ER 1110-2-240, Section 3-4. In addition, there are Corps requirements for internal and external coordination (with both the public and stakeholders) of deviations from the water control plan or manual separate and apart from the coordination with the Willamette Action Team for Ecosystem Restoration ("WATER") as prescribed by the 2008 WVP BiOp. ER 1110-2-240, Section 5. In addition, "[d]eviations that impact the fulfillment of authorized purposes, that occur in three or more consecutive years, or that occur more than three times within a five-year period must be fully coordinated with [Corps Headquarters]." *Id.* at Section 3-4(h) (emphasis supplied). Moreover, any changes in operation inconsistent with or outside the bounds of existing authorities require congressional authorization prior to implementation.

B. Listing of Affected Salmonids and Corps' Efforts to Comply with the ESA

29. In March 1999, the National Marine Fisheries Service ("NMFS") listed both the Upper Willamette River ("UWR") spring Chinook salmon and UWR winter-run steelhead as threatened species under the ESA. 64 Fed. Reg. 14,308 (Mar. 24, 1999); 64 Fed. Reg. 14,517 (Mar. 25, 1999). Because the ongoing operations of the WVP were cited as factors causing adverse effects to both of these listed fish, the Corps, along with the Bonneville Power Administration and Bureau of Reclamation (collectively, "WVP Action Agencies"), initiated

consultation with NMFS and the U.S. Fish and Wildlife Service ("FWS") pursuant to the ESA on the effects of the continued operation and maintenance of the WVP, including Detroit Dam, on affected species listed as threatened or endangered under the ESA, and on their critical habitat. The first formal step in this consultation was the WVP Action Agencies' submission of a Biological Assessment ("WVP BA") to NMFS and FWS on April 26, 2000, which they followed up by providing a Supplemental Biological Assessment ("Supplemental WVP BA") to the consulting agencies on May 31, 2007.

30.  This initial round of consultation was not completed until more than eight years later, when NMFS issued a Biological Opinion in July 2008 ("NMFS 2008 BiOp"). In that NMFS 2008 BiOp, NMFS concluded that the ongoing operation and maintenance of the WVP would jeopardize the continued existence of UWR Chinook salmon and UWR steelhead, and destroy or adversely modify those ESUs' designated critical habitat, in violation of the standard in Section 7(a)(2) of the ESA. As a result, NMFS developed a Reasonable and Prudent Alternative ("RPA") that can be carried out consistent with the purpose of the consulted-on action, is within the scope of the action agencies' legal authority, is economically and technologically feasible, and that NMFS opined would allow the Corps to avoid violating the core requirements of Section 7(a)(2) of the ESA to avoid taking actions likely to jeopardize the continued existence of the listed UWR Chinook and Steelhead or destroying or adversely modifying their critical habitat designated under the Act, consistent with the requirements of 50 CFR § 402.02.

31.  The RPA in the 2008 BiOp comprises a series of 96 measures, some defined as short-term (to be implemented within the first one-to-seven years), and others defined as long-term. Importantly, however, the 2008 BiOp expressly provides that decision-making for all of the final actions and implementation of measures included in the RPA must comply with all

applicable statutes and regulations.  Among those the Action Agencies must consider are NEPA, the Clean Water Act and the Northwest Power Act.  There are no exceptions identified for those measured identified as "short-term" or "interim" in this regard.

32.  The RPA measures are broken down into ten different categories, one of which is referenced as "Fish Passage" that includes a variety of different operational or structural modifications designed to provide or enhance upstream and/or downstream passage of the listed fish at WVP dams.  Many of the measures in this category include another more refined layer of measures specific to particular WVP projects.

33.  For example, RPA Measure 4.12, entitled "Long-term Fish Passage Solutions," calls generally for the development of additional structural and operational modifications to allow safe fish passage and access to habitat above and below WVP Dams.  It goes on to explain that these modifications are to be analyzed and developed through a formal process and as part of preparation of a Willamette Configuration Operation Plan ("COP") that will evaluate a range of alternative approaches to improving fish passage and water quality conditions, temperature and total dissolved oxygen in particular, at or downstream from the dams, including Detroit Dam (see RPA Measure 4.12.3).

34.  Importantly, RPA Measure 4.12, along with RPA Measure 4.13, also sets forth a fairly rigorous process that the Action Agencies must follow prior to implementing any such measures.  More specifically, it provides that the Action Agencies, FWS, and NMFS are to evaluate the information gathered through preparation of the COP, NEPA analysis, RM&E measures, and any other sources of information such as ESA recovery planning, university studies, local monitoring efforts, and public comment, in order to determine which modification(s) will provide the most cost-effective means to achieve benefits to ESA-listed fish,

and then, and only then, proceed with their implementation.  The measure also expressly

acknowledges that the Action Agencies may need to complete appropriate NEPA analyses and

obtain congressional authorization and appropriations before implementation, thereby

recognizing that certain modifications may well lie outside the Corps' existing statutory

authorization and mandates.

35.  In addition, RPA Measure 4.8 calls for the adoption and implementation of Interim

Downstream Fish Passage through Reservoirs and Dams.  More specifically, it states that: "Until

permanent downstream passage facilities are constructed or operations are established at Project

dams and reservoirs in subbasins where outplanting of UWR Chinook salmon and steelhead is

underway, the Action Agencies will carry out interim operational measures to pass downstream

migrants as safely and efficiently as possible downstream through Project reservoirs and dams

under current dam configurations and physical and <u>operational constraints, and consistent with</u>

<u>authorized Project purposes</u>" (emphasis supplied).

36.  Those interim measures prescribed by RPA Measure 4.8 that require detailed

environmental review, permits, or congressional authorization are to be incorporated into the

Action Agencies' preparation of the COP required by RPA Measure 4.13.  The measures

prescribe completion of this component of the COP by April 2011, including seeking

authorization (if necessary) and completing design or operational implementation plans for those

interim operational initiatives selected in the COP process.  The Action Agencies are in turn

called upon to begin to carry out measures selected by the COP by May 2011, contingent on

funding, authorization, and compliance with all applicable statutes and regulations.

37.  The RPA Measures also include a number of time frames and deadlines for their

completion.  A decade or so into the term of the 2008 WVP BiOp, the Corps acknowledged that

it was woefully behind the time frames set forth in the RPA and would not be able to fully

implement the RPA measures to satisfy them, and therefore, in April 2018, reinitiated ESA

consultation with the Services.

C.    Corps' NEPA Analysis of its Operations of WVP, including Detroit Dam

38.    Some two decades prior to the listing of any aquatic species affected by operation

and maintenance of WVP facilities, including the Detroit Dam, in May 1980, the Corps prepared

an EIS pursuant to NEPA on "Operations and Maintenance of the Willamette Reservoir System"

("1980 WRS EIS").  This is the only comprehensive NEPA analysis of WVP operations the

Corps has conducted in the 50 years since NEPA was enacted, and represents the only completed

NEPA analysis of operations at Detroit Dam that the Corps has conducted within that same time

frame.  As a result, it has been more than four decades now since the Corps has completed any

NEPA analysis relevant to hydropower operations at Detroit Dam.

39.    With particular respect to power production at each of the eight projects within the

WVP that generate hydropower, the 1980 EIS states as follows:  "The daily operation of the

Willamette power facilities usually follows a set pattern:  The Corps' Reservoir Control Center

(RCC) in Portland initiates the first step.  Each morning the center determines how many hours

each project can generate electricity.  The criteria used for this determination are:  the volume of

water entering each reservoir; the volume of water which must be released from each reservoir to

maintain desired stream flows; the seasonal reservoir regulation schedule as defined by the rule

curve.  Personnel from RCC then inform BPA, by telephone, of the number of hours the

generators can operate.  The next step is for BPA to match energy supply with energy demand

and schedule the necessary generation for each project in the entire Columbia River system.

BPA informs RCC, by telephone, of this scheduling and RCC then notifies each project in the

Willamette by teletype.  To summarize, the Corps determines how many hours the generators can operate and BPA determines when the generators will operate."

40.  The 1980 FEIS also explains that Detroit Dam has a reregulating project downstream, the Big Cliff Project, which allows water released through Detroit Dam to be "timed to correspond to peak demand for electricity" given that Big Cliff can catch releases from Detroit and hold them for more constant releases downstream.

41.  The 1980 FEIS goes on to describe how the total firm power commitments of Willamette project are relatively minimal when compared to the entire Northwest, but that the raw amount of power produced is not as important as when that power is produced.  The EIS explains that this is because Willamette power generation offsets demand on the Columbia system, conserving water needed for generation to meet peak power demands in December and January.  By that time, floods usually occur in the Willamette Basin allowing power reservoirs to maintain their output.

42.  With respect to fish and wildlife mitigation on the North Fork-Santiam, the 1980 FEIS explains that, "[f]or Big Cliff-Detroit projects no passage facilities were constructed. Mitigation is accomplished by hatchery production. Adults migrating upstream are trapped below Big Cliff Dam at Minto holding pond.  Spawn taken at Minto is artificially propagated at Marion Forks Hatchery."  The EIS also explains that, "[f]ollowing storage of large winter flows, reservoirs are evacuated as rapidly as downstream conditions will permit after the flood threat has passed.  This evacuation schedule usually requires much of the water to bypass generation facilities."  In addition, it states that "Current operations call for essentially a complete halt in releases including flows from power generation during critical floods.  This constraint on power

plant operations limits the dependability of Willamette Valley generation at a time of year in which power tends to be at its highest demand."

43.   In November 2017, the Corps issued a Notice of Intent to prepare an EIS for the Detroit Dam Downstream Fish Passage and Temperature Control Project ("DDDP").  82 Fed. Reg. 55,830 (Nov. 24, 2017).   The Proposed Action subject to analysis in the DDDP EIS is designed to implement RPA measure 4.12.3 from the 2008 BiOp, "Detroit Dam Downstream Passage," which states that the Action Agencies "would investigate the feasibility of improving downstream fish passage at Detroit Dam and if found feasible they would construct and operate downstream passage facilities."  *Id.*  RPA 4.12.3 also provides that "Temperature control would also be considered in designing the passage facility."  As a result, the two-fold Purpose of the Proposed Action is to, consistent with satisfying all of the other authorized Detroit Dam Project purposes—(1) enhance fish passage of Upper Willamette River (UWR) Chinook salmon and steelhead on the North Santiam River to reaches downstream of the Detroit and Big Cliff dams; and (2) modify temperatures on the North Santiam and mainstem Santiam Rivers below Detroit Dam with the objective of meeting operational temperature targets optimized for adult and juvenile salmonids.  With respect to the action alternatives to be considered in the EIS, the Notice of Intent provides that both structural and operational alternatives will be considered. The Corps issued the Draft EIS for the DDDP in May 2019.

44.   On April 1, 2019, the Corps published a Notice of Intent that its Portland District would prepare an Environmental Impact Statement (EIS) to address the continued operations and maintenance of the WVP in accordance with authorized project purposes while also complying with its ESA obligations.  84 Fed. Reg. 12,237 (Apr. 1, 2019).  In doing so, the Corps acknowledged that:  (1) the most recent NEPA evaluation it had conducted for overall WVP

operations and maintenance was the EIS it completed in 1980; since that time, it had modified its operations and constructed structural improvements for fish passage and temperature control in an effort to ameliorate effects of the WVP; and (3) significant new information relevant to the environmental impacts of operating the WVP had come to light in the last forty years since its last comprehensive NEPA analysis of the WVP.  It explained that the "Action Alternatives" to be addressed in the EIS would consist various measures for continued operations and maintenance of the WVP, as well as those that will be developed to meet its ESA obligations to avoid jeopardizing the continued existence of listed species.  The Corps projected that the Draft EIS for this Proposed Action will be made available for public comment during Fall/Winter 2020.

D.    Litigation Challenging the Corps' Failure to Implement the RPA in the 2008 BiOp

45.    In March 2018, Northwest Environmental Defense Center, WildEarth Guardians, and the Native Fish Society brought an action in this Court against the Corps and NMFS, challenging the Corps' failure to timely implement the RPA in the 2008 WVP BiOp and both agencies' failure to have reinitiated consultation under the ESA.  *Northwest Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, Case No.: 3:18-cv-00437-HZ (D. Or.) ("*NEDC RPA Case*").

46.    After the Court denied their motion for a preliminary injunction seeking a multiplicity of interim fish conservation measures on the ground that plaintiffs in that case had failed to demonstrate they would suffer irreparable harm absent such relief pending resolution of their claims on the merits, *NEDC RPA Case*, Op. & Order, Dkt. #84 (June 5, 2019), the Court eventually granted summary judgment in their favor on each of their claims. *Id.*, Dkt. #112 (Aug. 17, 2020).  More specifically, the Court ruled that the Corps is violating Section 7(a)(2) of the ESA because its ongoing operation and maintenance of the WVP is jeopardizing the continued existence of UWR Chinook and UWR steelhead and destroying and/or adversely modifying

those species' critical habitat based largely on its failure to timely implement key measures of the RPA in the 2008 WVP BiOp; the Corps is also violating Section 9 of the ESA because its operation and maintenance of the WVP is causing unlawful "take" of UWR Chinook salmon and UWR steelhead in excess of the level authorized by the Incidental Take Statement in the 2008 WVP BiOp; and the Corps and NFMS acted in an arbitrary and capricious manner in failing to have timely reinitiated consultation under the ESA notwithstanding the Corps' failure to have implemented large portions of the RPA in the 2008 WVP BiOp and its attendant violations of the ESA.  In its summary judgment opinion, the Court addressed the Corps' argument that, due to the statutorily prescribed purposes of WVP projects, including Detroit Dam, it lacks the authority to carry out operational changes that forgo hydropower production for an extended period of time.  In response, the Court stated that the issue of "the Corps' <u>authority to carry out interim operational measures</u> is a question that should be resolved at the remedy phase of this case," based on its stated expectation that plaintiffs would be likely to request this type of relief during that phase.  *NEDC RPA Case*, 2020 WL 4756323, at *17 n.6 (emphasis supplied).

47.   The parties in the *NEDC RPA Case* are now in the midst of the remedy phase and have presented briefs and competing slates of proposed remedies that would be appropriate for the Court to order pending the Corps' completion of reinitiated consultation with NMFS and the issuance of a new Biological Opinion in accordance with the Court's summary judgment ruling.  As part of that briefing, plaintiffs submitted a set of nearly 60 injunction actions that they are asking the Court to impose until the WVP Action Agencies are able to complete reinitiated consultation.  NEDC RPA Case, Dkt. #117-1.  One of these elements plaintiffs are seeking is extremely similar to Interim Measure no. 5 except with respect to the particular hours that the hydropower turbines would be inoperable at Detroit Dam.  In particular, it seeks to have the

Court order the Corps in its operation of Detroit Dam, "[f]rom Nov 1 through Feb. 1, [to] use upper [Regulating Outlets] and turn off turbines during the hours of 4 pm to 8 am." *Id.* With respect to the impact to power production, in particular during the peak demand period of the day, however, the measures are largely indistinguishable.

48. In its papers opposing the adoption of this measure, the Corps stated as follows in the Declaration of Sean Askelson: "This injunction action would negatively impact hydropower and water quality, specifically the ability to meet temperature control targets downstream. The Plaintiffs' proposed injunction action calls for the use of the turbines to be shut off and all water to be released through the upper regulating outlets from 1 November through 1 February during the hours of 4 pm to 8 am. Releases during these hours are during prime power peaking hours, or high demand hours, (prime peaking hours are from 6 am to 10 am and 4 pm to 10 pm) which would limit production from 8 am to 10 am under this proposal. This time of year is optimal for generation in the Willamette due to the higher releases necessary during FRM operations and typical higher energy needs in the region. This will impact approximately 80% of the preferred peaking hours at Detroit substantially impacting the power production of Detroit Dam for three months." *NEDC RPA Case*, Askelson Declaration at ¶ 64 (Dkt. #132).

49. Moreover, the Corps also opposed certain of plaintiffs' proposed permanent injunction actions on the ground that they "conflict with Congress' authorizations on how the Corps should operate the WVP." *NEDC RPA Case*, Defs.' Rem. Brf. at 10 (Dkt. #130). It opposed others on the basis that they would "negatively impact authorized project purposes that bring important benefits to the region," and specifically referenced hydropower as such a purpose in this context. *Id.* The Corps also noted that many if not most of the elements of plaintiffs' proposed remedial measures are simply not implementable because they had not gone

through the requisite procedural and analytical steps required before the Corps can substantially modify operations at one of its WVP Projects, including Detroit, as follows: "The Corps has stringent processes in place to evaluate changed operations for a reason—these evaluation processes avoid harms that necessarily will arise with ad hoc modifications to complex water management systems." *Id.* at 37. It then castigated plaintiffs for their "cavalier approach to altering WVP operations and bypassing environmental reviews that Congress mandated must precede agency action," even though the Corps itself has taken a similar tack by announcing Interim Measure No. 5 in a news release and implementing it in the absence of appropriate procedural requirements or any public involvement.

50. In support of its opposition to plaintiffs' proposed permanent injunction actions, the Corps also submitted a legal memorandum prepared by its General Counsel's Office that analyzes the extent to which the agency believes it has the authority to curtail, undermine, or eliminate a statutorily prescribed project purpose. *Id.* at 25. The Corps explained that it has adopted this legal memorandum for purposes of its operations of the WVP. *Id.*

51. This legal memorandum draws a distinction between ad hoc, episodic adjustments that the Corps has long made at its WVP facilities for which power is a statutorily prescribed purpose at times of the year outside the Critical Power Production Period based on variable conditions, and planned operational changes that substantially impair or eliminate power production during that period. *NEDC RPA Case*, Att. 1 to Declaration of Frances E. "Beth" Coffey (Dkt. #131-1). More specifically in this regard, the Corp' legal memorandum opines that "[r]eleases from conservation storage at other times of the year other than the critical power production period, and the limited releases contemplated in the Water Control Manuals for minimum flows during that period, <u>are materially different from deep drawdowns that would</u>

substantially interfere with or completely preclude power generation during the critical power production period." *Id.* at 5 (emphasis supplied). Therefore, pursuant to the Corps' own expressly adopted legal opinion on the subject, it may not adopt any interim measures that would substantially interfere with power generation during the Critical Power Production Period.

52. In addition, in response to the NEDC RPA litigation, the Corps and NMFS advised the Court that they would begin working on a series of "interim measures" that the Corps would implement to benefit UWR salmonids during the reinitiated consultation process. Apparently pursuant to this representation, in June 2020, a revised version of a "Willamette Valley Project Interim Measures Implementation Plan" ("Revised WVP Interim Measures Plan") was produced. On information and belief, and based in part on a representation in the November 2020 News Release, PPC believes that the revised plan was the result of "collaboration between experts from the Corps and National Marine Fisheries Service," although it is unsigned and unattributed, and there is no indication it was ever made available to the public or stakeholders such as PPC upon its completion. The revised interim plan sets forth 26 measures, one of which is designated as Interim Measure no. 5. In relevant part, that interim measure is summarized as follows:

> Beginning in fall 2020, the Corps will modify Detroit Dam operations during the drawdown when fish passage rates are high, as follows: Once the reservoir elevation is less than 100 feet over the turbine intakes (elevation 1500 feet to 1450 feet), typically around November 1 through February 1, turbines will not be operated at Detroit Dam between 6:00 AM - 10:00 AM and 6:00 PM - 10:00 PM except for station service power.

53. The Revised WVP Interim Measures Plan expressly provides that "[i]mplementation of all interim measures is subject to the Corps' compliance with all applicable laws, including NEPA and the [ESA]." In this regard, however, the revised plan simply states in conclusory fashion that "[t]his measure does not require additional NEPA analysis" and that the "ESA effects fall within the scope of the 2008 NMFS BiOp"

without providing any explanation or basis for either such conclusion.  Nor does the revised plan anywhere reference, let alone discuss the measure's impacts on, the statutorily prescribed purpose of hydropower production at Detroit Dam.

54.   Some five months later, on November 9, 2020, the Corps posted a two-page news release on its website unilaterally announcing to the public for the first time that it was implementing Interim Measure No. 5 at Detroit Dam, an action which was already underway when the news was posted.  More specifically, the news release indicates that the Corps had determined to undertake a substantial modification of its normal operations at the dam by shutting down hydropower turbines and instead releasing water through the upper regulating outlets for eight hours every day during the three-month period of November, December, and January.  These three months fall during the "Critical Power Production Period" when the Dam's congressionally approved authorization documentation prescribes maximization of power production.  Moreover, the Corps announced that it will not operate the turbines between the hours of 6-10 a.m. and 6-10 p.m., which are associated as times of peak power demand, in an effort to benefit juvenile downstream passage of fish.  https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/2410006/corps-modifies-operations-to-improve-salmon-passage-at-detroit-dam/.  In the news release, the Corps stated that the power shutdown during the Critical Power Production Period is one of the "interim measures" it is planning to implement to benefit ESA-listed salmon in the Willamette River Basin while it works to complete the WVP EIS and reinitiated consultation pursuant to the ESA.

55.   The news release does not reference power production whatsoever, nor does it purport to discuss impacts of the interim measure to that statutorily prescribed purpose of Detroit Dam.  Nevertheless, preliminary calculations PPC has conducted based on publicly available

power production data from the Corps and analysis of historical generation data from FY 2009 through FY 2020 show that power production at Detroit Dam may be reduced by an average of 44 percent and up to approximately 60 percent during the Critical Power Production Period months of November through January.  Moreover, by its own terms Interim Measure No. 5 eliminates power production virtually entirely during approximately 80 percent of the preferred peaking hours at Detroit Dam, thereby substantially impacting the power production of the dam for three months during this same Critical Power Production Period.  Looked at on an annual basis, Interim Measure No. 5 stands to reduce power production by an average of 15-20 percent off of Detroit Dam's normal annual average power production since adoption of the 2008 WVP BiOp.  Yet the Corps, on information and belief, has not performed any similar analysis or even considered any of these likely impacts to the statutorily prescribed purpose of power production at Detroit Dam from its adoption and ongoing implementation of Interim Measure No. 5.

E.    Enactment of 2020 WRDA

56.  Section 218 of the Water Resources Development Act of 2020 was enacted as part of the Omnibus FY2021 Consolidated Appropriations Act and COVID Relief Act that the President signed into law on December 27, 2020.  Among other things, that provision requires the Corps, within two years, to prepare, make publicly available, and submit to the relevant congressional committees of jurisdiction "a report providing an initial analysis of deauthorizing hydropower as a project purpose" at Detroit Dam and two other WVP facilities.  In preparing this report, the Corps is instructed to address the potential effects of deauthorizing hydropower as a project purpose at Detroit Dam on, among other things, its compliance with the ESA.

57.  The relevance of the congressional enactment of this provision to the present complaint is that it reveals that the only appropriate pathway for the Corps to be able to walk

away from or substantially undermine its statutorily prescribed obligation to operate Detroit Dam

for power production, particularly during the Critical Power Production Period, is for the

Congress to deauthorize hydropower as a project purpose.  This point is even more salient now

that the Congress has actually ordered the Corps to prepare a study to examine doing just that.  It

therefore further reinforces that, until such time as the Corps prepares this study and the

Congress were in fact to amend the statutory authorities underlying Detroit Dam to deauthorize

hydropower production as one of its statutorily prescribed purposes, the Corps must continue to

operate the dam to serve that purpose, particularly during the Critical Power Production Period.

## CLAIMS

### FIRST CLAIM FOR RELIEF
Violation of Flood Control Acts of 1938, 1948, and 1950 and Administrative Procedure Act
Acting in Excess of Statutory Jurisdiction and Authority
(5 U.S.C. § 706(2)(C))

58.  Plaintiff incorporates by reference the allegations set forth in the preceding

paragraphs.

59.  The APA, 5 U.S.C. § 706(2)(C), provides that a court shall hold unlawful and set

aside agency action found to be in excess of statutory jurisdiction, authority, or short of statutory

right.

60.  The Corps must operate the Detroit Dam in accordance with the statutory purposes

and mandates under which the project was authorized, in particular in the Flood Control Acts of

1938, 1948 and 1950.  The Corps itself has issued a legal opinion stating its understanding of this

statutory mandate.

61.  One of the statutorily prescribed purposes of the Detroit Dam is hydropower

production.  The House Report that the Congress approved in authorizing the construction and

operation of the project indicates that power production is particularly important during what it

defines as the "Critical Power Production Period" of November-April each year, during which power production is to be maximized to meet load requirements, particularly during peak demand periods of the day.  This is how Detroit Dam was operated until the Corps adopted Interim Measure No. 5.

62.  Until and unless hydropower production is deauthorized as a statutorily mandated purpose of Detroit Dam, the Corps is not at liberty to disregard or substantially impair that purpose.  The recent enactment of Section 218 of the 2020 WRDA bill shows the only appropriate vehicle by which this might be accomplished by directing the Corps to study deauthorizing hydropower production as a statutorily prescribed purpose of Detroit Dam.

63.  Nor does merely slapping the qualifier, "interim," on a measure, no matter how well-intentioned, absolve the Corps from its statutory responsibility to manage Detroit Dam in accordance with that statutory purpose.  The Corps' adoption and implementation of Interim Measure No. 5 is affecting, and will continue to affect, a substantial interference with hydropower generation during the Critical Power Production Period.  As such, it is clearly outside the Corps' statutory authority within the meaning of 5 U.S.C. § 706(2)(C).  For the same reasons, the measure is ultra vires.  *See Sierra Club v. Trump*, 963 F.3d 874, 89-91 (9th Cir. 2020).  On either or both grounds, the Court must vitiate and/or set aside Interim Measure No. 5.

SECOND CLAIM FOR RELIEF
Violation of Administrative Procedure Act—Arbitrary and Capricious
(5 U.S.C. § 706(2)(A))

64.  Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

65.  The APA, 5 U.S.C. § 706(2), provides that a court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.  The Corps' adoption and implementation of Interim Measure No. 5 comprises final agency action because it marks the consummation of the agency's decision-making process, and it is one by which rights or obligations have been determined, or from which legal consequences will flow.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

66.  In determining whether an action violates Section 706(2)(A) of the APA, a federal court must evaluate whether the agency examined relevant data, considered all relevant factors, and articulated a satisfactory explanation for its decision, including formulating a rational connection between the facts found based on consideration of each of the relevant factors and the agency's ultimate decision subject to review.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency's failure to consider all relevant factors renders its decision "arbitrary and capricious" in violation of the APA standard. *Department of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).  Reasoned decision-making under the APA requires a rational explanation for agency action supported by the agency's administrative record.  *Department of Commerce v. New York*, 139 S. Ct. 2551, 2576 (2019).  Moreover, where an agency wishes to depart from its earlier longstanding practice, it must acknowledge that change and explicitly evaluate the impact to any reliance interests its previous actions may have engendered.  *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 105-06 (2015).

67.  The Corps' adoption and implementation of Interim Measure No. 5 is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) on various grounds, including but not limited to the following;

a. The Corps failed to consider all relevant factors in adopting the measure, in particular its impact on hydropower production at Detroit Dam;

b.  The Corps failed to expressly consider or adhere to its own legal standard that it has now adopted pursuant to the legal memorandum its General Counsel's Office has issued in regard to compliance with its statutory authority to serve power production at Detroit Dam;

c.  The Corps failed to provide any of but the barest of explanations for its adoption of Interim Measure No. 5 in a scant two-page news release or explain how any facts on which it may be putatively based support its decision to adopt the measure;

d.  Interim Measure No. 5 represents a substantial modification from its ordinary, longstanding operations at Detroit Dam and the direction it has adopted and that has been approved for operations at the dam, and the Corps failed to comply with its own internal direction to engage in the necessary process for undertaking a deviation from that direction;

e.  The Corps failed to account for or seek to provide an opportunity for those most directly affected by Interim Measure No. 5 to be heard with respect to the substantial reliance interests that they have in ordinary Detroit Dam operations before adopting the measure.

68.  The Court therefore needs to set aside Interim Measure No. 5 pursuant to 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
Violation of National Environmental Policy Act & Administrative Procedure Act—Agency Action Taken Without Observance of Procedure Required by Law
(5 U.S.C. § 706(2)(D))

69.  Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

70.  The APA, 5 U.S.C. § 706(2)(D), provides that a court shall hold unlawful and set aside agency action found to be undertaken without observance of procedure required by law.

71.  NEPA provides that an agency shall consider the environmental and related effects of its proposed actions before committing resources to implement them in accordance with the statute and applicable implementing regulations.  40 C.F.R. Part 1500; 33 C.F.R. Part 230.

72.  This Court has ruled that operations of federal hydropower projects are subject to NEPA in particular upon adoption of measures to comply with the ESA.  *National Wildlife Fed'n v. NFMS*, 184 F. Supp. 3d 861 (D. Or. 2016).  In that same case, the Court ruled that EISes that were fewer than 20 years old were "unreasonably stale" and needed to be updated or supplemented in order to comply with NEPA.  Id. at 936-37.  It also held that narrower NEPA documents to address particular elements of a larger collectively managed hydropower system were not adequate to satisfy this need for updating and supplementation.  Id. at 937-38.

73.  The Corps has not prepared a comprehensive EIS evaluating the environmental and other related effects of the WVP since 1980, more than 40 years ago.  Nor has it addressed Interim Measure No. 5 into any of its narrower completed NEPA documents or purported to incorporate or consider the effects of the measure in any of its ongoing NEPA processes to evaluate downstream fish passage alternatives at Detroit Dam.

74.  Consequently, the Corps' adoption and implementation of Interim Measure No. 5 violates the procedural requirements of NEPA and the Court therefore needs to set it aside as having been undertaken without observance of procedure required by law pursuant to 5 U.S.C. § 706(2)(D).

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

A.  Adjudge and declare that, in adopting and implementing Interim Measure No. 5, the Corps is violating the Flood Control Acts that prescribe the statutory authorities for the

construction, maintenance, and operation of Detroit Dam, as well 5 U.S.C. § 706(2)(C) of the APA by acting in excess of statutory jurisdiction, authority, or short of statutory right.

B.  Adjudge and declare that, in adopting and implementing Interim Measure No. 5, the Corps is acting ultra vires.

C.  Adjudge and declare that, in adopting and implementing Interim Measure No. 5, the Corps has acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706(2)(A) of the APA.

D.  Adjudge and declare that, in adopting and implementing Interim Measure No. 5, the Corps is violating NEPA and its applicable implementing regulations, as well as 5 U.S.C. § 706(2)(D) of the APA by acting without observance of procedure required by law,

E.  Set aside and vitiate Interim Measure No. 5, and enjoin the Corps from implementing it or adopting or implementing any other measure that will substantially interfere with hydropower production at Detroit Dam, or any measures that will adversely affect hydropower production at Detroit Dam without first complying with NEPA and its other procedural duties;

F.  Award Plaintiff its reasonable costs, litigation expenses, and attorneys' fees associated with this litigation as may be appropriate pursuant to applicable law; and

G.  Grant such other further relief as the Court may deem just and proper.


Respectfully submitted this 8th day of January 2021.


s/ Stephen J. Odell
STEPHEN J. ODELL, OSB # 903530
Marten Law, LLP

IRENE A. SCRUGGS, OSB # 065030
General Counsel, Public Power Council