JEAN E. WILLIAMS, Acting Assistant Attorney General
ROMNEY PHILPOTT, Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1810 | Fax: (303) 844-1350
Email: Romney.Philpott@usdoj.gov

*Attorneys for Federal Defendant*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

**PUBLIC POWER COUNCIL**,

Plaintiff,

v.

**U.S. ARMY CORPS OF ENGINEERS**,

Defendant.

Case No.: 3:21-cv-00032-HZ

**FEDERAL DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT UNDER RULE 12(b)(1), OR IN THE ALTERNATIVE, PLAINTIFF'S SECOND AND THIRD CLAIMS UNDER RULE 12(b)(6)**

DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

MOTION AND INTRODUCTION.................................................................................1

STATUTORY AND FACTUAL BACKGROUND .....................................................2

    A.    The Corps' Operation of Detroit Dam and Interim Measure No. 5......................2

    B.    Hydropower from the FCRPS...........................................................................5

    C.    PPC's Claims in this Litigation .......................................................................8

STANDARD OF REVIEW .........................................................................................8

ARGUMENT ..............................................................................................................9

    I.    Plaintiff's Failure to Adequately Allege Standing Deprives this Court of Jurisdiction...............................................................................................10

        A.    PPC has not alleged an actual injury to itself as an organization ...........11

        B.    PPC has not alleged a factual basis for associational standing for its asserted economic injury...................................................................12

            1.    PPC does not establish an actual injury to its members with respect to economic injuries.........................................................12

            2.    PPC fails to allege facts demonstrating causation for economic injury. ..........................................................................15

            3.    PPC fails to allege that its alleged injury could be redressed by the Court.......................................................................16

        C.    PPC Fails to Adequately Allege Non-Economic Injury .........................18

            1.    PPC does not allege an actual injury to its members.................18

            2.    Environmental interests are not germane to PPC's purposes .....22

        D.    PPC Fails to Allege Cognizable Procedural Injury.................................23

    II.    PPC's Second Claim, Asserting a Stand-Alone APA Claim, Fails under Ninth Circuit Precedent........................................................................25

    III.    PPC Does not Establish "Prudential Standing" for its NEPA Claim.................27

CONCLUSION.........................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Alcoa, Inc. v. Bonneville Power Admin.*,
  698 F.3d 774 (9th Cir. 2012) ..................................................................... 14

*Aluminum Co. of Am. v. Adminstr., Bonneville Power Admin.*,
  175 F.3d 1156 (9th Cir. 1999) ..................................................................... 5

*Am. Diabetes Ass'n v. U.S. Dept. of the Army*,
  938 F.3d 1147 (9th Cir. 2019) ........................................................... 11, 12, 22

*Animal Leg. Def. Fund v. Bernhardt*,
  19-CV-06812-JST, 2020 WL 6802838 (N.D. Cal. May 18, 2020) ......................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................... 9

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) .............................................................. 27, 28

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
  733 F.3d 939 (9th Cir. 2013) ..................................................................... 13

*Backes v. Bernhardt*,
  1:19-CV-00482-CL, 2020 WL 906313 (D. Or. Feb. 24, 2020)........................... 26

*Barron v. Reich*,
  13 F.3d 1370 (9th Cir. 1994) ...................................................................... 4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................. 9

*Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) .................................................................... 14

*Bras v. Cal. Pub. Utils. Comm'n*,
  59 F.3d 869 (9th Cir. 1995) ............................................................... 13, 14

*CA. Unions for Reliable Ener. v. U.S. Dept. of the Int.*,
  10-cv-9932-GW-SSX) 2011 WL 13116730 (C.D. Cal. June 13, 2011).................. 23

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
  889 F.3d 584 (9th Cir. 2018) .................................................................... 28

*CAlifornians for Renewable Energy v. Cal. Pub. Utilities Comm'n*,
  No. 08-cv-1954- JL, 2009 WL 10700582 (N.D. Cal. Feb. 10, 2009)...................... 9

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010) .................................................................... 8

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   341 F.3d 961 (9th Cir. 2003) ................................................................ 24

*City of Santa Clara, Cal v. Andrus*,
   572 F.2d 660 (9th Cir. 1978) .................................................................. 6

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).................................................................... 10, 13

*Common Cause v. Dep't of Energy*,
   702 F.2d 245 (D.C. Cir. 1983) .............................................................. 17

*Ctr. for Envtl. Sci. Accuracy & Reliability v. Nat'l Park Serv.*,
   14-cv-02063-LJO-MJS, 2016 WL 4524758 (E.D. Cal. Aug. 29, 2016) ................ 21

*Demoruelle v. Kucharski*, 19-cv-00269-JAO-RT,
   2019 WL 4739285 (D. Haw. Sept. 27, 2019) ........................................... 20

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) .............................................................. 27

*Ecological Rts. Found. v. Pac. Lumber Co*.,
   230 F.3d 1141 (9th Cir. 2000) ....................................................... 12, 20

*El Rescate Legal Servs. Inc. v. Exec. Off. of Immigr. Rev.*,
   959 F.2d 742 (9th Cir. 1991) ................................................................ 26

*Envtl. Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) .............................................................. 16

*Fair Hous. of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002) ................................................................ 11

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)............................................................................ 10

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
   593 F.3d 923 (9th Cir. 2010) ................................................................ 20

*In re Zappos.com, Inc*.,
   888 F.3d 1020 (9th Cir. 2018) .............................................................. 13

*Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*,
   861 F.3d 944 (9th Cir. 2017) ................................................................ 27

*Jensen v. Carr*,
   C11-1222RSL, 2012 WL 2190881 (W.D. Wash. June 14, 2012) .................... 4

*Kaszycki v. United States*,
   C19-1943 RSM, 2020 WL 2838598 (W.D. Wash. June 1, 2020) ................... 26

*Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) .............................................................. 11

*Lexmark Int'l, Inc., v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ........................................................................................ 27

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................................................ 26

*Lipsman v Sec'y of the Army*,
257 F.Supp.2d 3 (D.D.C. 2003) ....................................................................... 9

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................ 25

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) .................................................................... 8, 16

*MGIC Indem. Corp. v. Weisman*,
803 F.2d 500 (9th Cir. 1986) ........................................................................... 3

*Montana Shooting Sports Ass'n v. Holder*,
727 F.3d 975 (9th Cir. 2013) ......................................................................... 13

*Mortensen v. Cnty. of Sacramento*,
368 F.3d 1082 (9th Cir. 2004) ....................................................................... 13

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) ......................................................................... 16

*Nev. Land Action Ass'n v. U.S. Forest Serv.*,
8 F.3d 713 (9th Cir. 1993) ............................................................................. 28

*Nw. Requirements Utilities v. F.E.R.C.*,
798 F.3d 796 (9th Cir. 2015) ................................................. 13, 15, 16, 18, 19, 22

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) ...................................................................... 26, 27

*Pac. Nw. Generating Co-op. v. Dep't of Energy*,
580 F.3d 792 (9th Cir. 2009) ........................................................................... 6

*Pac. Power & Light Co. v. Duncan*,
499 F. Supp. 672 (D. Or. 1980) ....................................................................... 6

*Perales v. Casillas*,
903 F.2d 1043 (5th Cir. 1990) ....................................................................... 26

*Presidio Golf Club v. Nat'l Park Serv.*,
155 F.3d 1153 (9th Cir. 1998) ....................................................................... 23

*Pritikin v. Dep't of Energy*,
254 F.3d 791 (9th Cir. 2001) ......................................................................... 17

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
415 F.3d 1078 (9th Cir. 2005) .................................................................. 23, 28

*Risto v. Screen Actors Guild,*
    2:18C-cv-07241-CAS-PLA, 2018 WL 7016345 (C.D. Cal. Nov. 6, 2018) .............................. 4

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) .................................................................................. 3, 8, 9

*Smith v. Pac. Props. & Dev. Corp.,*
    358 F.3d 1097 (9th Cir. 2004) ......................................................................................... 11

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ..................................................................................................... 10

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................. 20, 21, 22, 24, 25, 29

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ......................................................................................................... 13

*Thomas v. Mundell,*
    572 F.3d 756 (9th Cir. 2009) ........................................................................................... 20

*U.S. Army Corps of Eng'rs,*
    479 F. Supp. 3d 1003 (D. Or. 2020) ................................................................................ 3

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) ........................................................................................ 4, 9

*United States v. W. Radio Servs. Co.,*
    869 F. Supp. 2d 1282 (D. Or. 2012) ......................................................................... 28, 29

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................................................... 9, 20

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ........................................................................................... 8

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ......................................................................................................... 13

**Statutes**

16 U.S.C. § 825s ...................................................................................................................... 6

16 U.S.C. § 839e(a)(1) ............................................................................................................ 6

16 U.S.C. § 839e(i) .................................................................................................................. 6

18 U.S.C. § 838(g) ................................................................................................................... 6

5 U.S.C. § 702 ....................................................................................................................... 25

Pub. L. No. 75-761, 52 Stat. 1222 (1938) ............................................................................. 2

Pub. L. No. 80-858, 62 Stat. 1178 (1948) ............................................................................. 2

Pub. L. No. 81-516, 64 Stat. 163 (1950)........................................................................................ 2

## MOTION AND INTRODUCTION

The U.S. Army Corps of Engineers ("Corps"), respectfully moves the Court to dismiss Plaintiff Public Power Council's ("PPC") Amended Complaint for lack of standing pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, or, in the alternative, PPC's second and third claims for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Pursuant to Local Rule 7-1, counsel for the Corps conferred with counsel for PPC and discussed the grounds for this motion, but the parties have been unable to resolve their dispute.

In this case, PPC challenges the Corps' implementation of Interim Measure No. 5. Interim Measure No. 5 is an operational modification that the Corps is implementing at one of its dams in an effort to improve survival of juvenile Upper Willamette River Chinook ("UWR Chinook"), which are a listed population under the Endangered Species Act ("ESA").

PPC has failed to demonstrate that it has standing for its claims. Ostensibly, PPC alleges an economic injury in that the rates its members pay for federal hydropower may increase at some point in the future as a result of Interim Measure No. 5. But, it fails to allege any facts supporting its supposition that such rates necessarily will increase, let alone that they will do so because of Interim Measure No. 5. The rates for the federal power at issue are set in a complicated administrative process that encompasses the provision of power from a system of dams and other infrastructure located throughout the Pacific Northwest. PPC has not alleged whether, when, and how changes resulting from Interim Measure No. 5 will cause economic harm to it and its members through higher power rates—and speculative allegations of possible future harm (particularly without addressing causation) cannot support standing. Nor does PPC

identify any concrete injury from its allegation that Interim Measure No. 5 impairs its members' access to power.

PPC also fails to allege a cognizable non-economic injury resulting from Interim Measure No. 5. Although it asserts an opaque interest in avoiding "improperly adopted and legally invalid fish conservation and riverine, aquatic, and riparian habitat restoration measures," it fails to describe any actual injury to its members. Am. Compl. ¶ 14. To the extent this interest can be stretched to allege possible environmental injury, PPC fails to allege that any such injury would be particularized to PPC's members. For similar reasons—namely, PPC's failure to allege any concrete injury to its members—it also cannot establish any procedural injury. As such, PPC has not established a basis for this Court's jurisdiction under Article III of the U.S. Constitution.

Even if it had adequately invoked the Court's jurisdiction, two of PPC's three claims fail as a matter of law. PPC's second claim—alleging that the Corps' adoption of Interim Measure No. 5 is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") is untenable under well-established Ninth Circuit precedent. PPC's third claim, asserting a violation of the National Environmental Policy Act ("NEPA"), fails because PPC's asserted economic injury falls outside of NEPA's zone of interests.

## STATUTORY AND FACTUAL BACKGROUND

### A.    The Corps' Operation of Detroit Dam and Interim Measure No. 5

The Corps operates and maintains the Detroit Dam and Reservoir Project (the "Detroit Project" or "Detroit"), which is located on the North Santiam River, for flood control, navigation, hydropower, and other authorized purposes. Am. Compl. ¶¶ 21-23; Pub. L. No. 75-761, 52 Stat. 1222 (1938); Pub. L. No. 80-858, 62 Stat. 1178 (1948), Pub. L. No. 81-516, 64 Stat. 163 (1950). The Detroit Project is part of a larger system, the Willamette Valley Project

("WVP"), which includes thirteen multipurpose federal dams and reservoirs in the Willamette

River basin that the Corps operates for flood risk management, navigation, and other purposes.

Am. Compl. ¶ 7.  The Corps' operation of the WVP was the subject of a 2008 biological opinion

("BiOp") issued by the National Marine Fisheries Service ("NMFS") pursuant to Section 7(a)(2)

of the ESA.  *Id.* ¶ 30.  Because the BiOp resulted in a "jeopardy" finding, NMFS developed a

Reasonable and Prudent Alternative ("RPA") for the Corps' operation of the WVP.  *Id.*

        In 2018, the Northwest Environmental Defense Center and two other environmental

groups (collectively "NEDC") filed a lawsuit alleging that the Corps and NMFS had violated the

ESA by failing to reinitiate consultation after the Corps did not timely implement various

measures from the 2008 BiOp's RPA.  *See NEDC v. U.S. Army Corps of Eng'rs* (hereinafter

*"NEDC v. Corps"*), 3:18-CV-00437-HZ (Compl. filed March 13, 2018); *see also* Am. Compl. ¶

48.  On August 17, 2020, this Court granted NEDC summary judgment, finding, *inter alia*, that

the Corps' failure to timely implement several RPA measures related to lack of safe downstream

fish passage and poor water quality violated ESA Section 7(a)(2); and that the Corps is causing

"take" of juvenile salmonids in excess of the Incidental Take Statement's limits, in violation of

ESA Section 9.  *NEDC v. Corps*, 479 F. Supp. 3d 1003, 1018 (D. Or. 2020).  The case is now in

remedy proceedings.

        In the meantime, in April 2018 (shortly after the *NEDC* case was filed), the Corps

reinitiated formal consultation with NMFS on WVP operations.  Am. Compl. ¶ 40; June 18,

2020 letter from Corps to NMFS (hereinafter "June 18 Letter"), attached hereto as Ex. A.[1]

---

[1] A court may review materials outside of the complaint to resolve a Rule 12(b)(1) motion.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  However, even for purposes of Rule 12(b)(6), this letter (as well as Exhibits B, C, and H) are properly before the Court as part of the judicial record in *NEDC v. Corps.  See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (on a motion to dismiss, the court may "take judicial notice of matters of public

Contemporaneously, the Corps issued a Notice of Intent informing the public that it would be preparing an Environmental Impact Statement ("EIS") under NEPA, addressing its operations and maintenance of the WVP in accordance with authorized project purposes while also complying with its ESA obligations.  Am. Compl. ¶ 46.  To protect the listed salmonids during the reinitiated consultation and NEPA process, the Corps continues to implement actions recommended in the 2008 RPA.  June 18 Letter.  In addition, the Corps and NMFS explored additional measures to benefit listed salmonids that the Corps could implement during the pendency of the reinitiated consultation and NEPA process.  *Id.*  Based on this collaboration, the Corps identified a series of 23 interim measures that it could carry out for the benefit of the listed salmonids and NMFS concurred with the Corps' decision to pursue their implementation.  June 22, 2020 Letter from NMFS to Corps, attached hereto as Ex. B.

One of these measures, Interim Measure No. 5, is the subject of this lawsuit.  Interim Measure No. 5 contemplates modified operations at the Detroit Project for approximately three months to improve passage survival for juvenile UWR Chinook salmon.  Second Declaration of R. Piaskowski ("Piaskowski 2d Decl.") ¶ 20, *NEDC v. Corps*, ECF 134, attached hereto as Ex. C; June 18 Letter.  Specifically, the Corps proposed not to operate turbines for two four-hour periods each day from November through January.  The measure is based on research indicating that operations to reduce downstream fish passage through the particular type of turbines installed at Detroit Dam would improve juvenile passage survival at the dam.  2d Piaskowski

---

record outside the pleadings" including filings in other cases).  So too with Exhibit D (*United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003) (documents referred to in complaint)); Exhibit E (*Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (government records)); Exhibit F (*Risto v. Screen Actors Guild,* 2:18C-cv-07241-CAS-PLA, 2018 WL 7016345, at *5 (C.D. Cal. Nov. 6, 2018) (annual report on party's website)) and Exhibit G (*Jensen v. Carr*, C11-1222RSL, 2012 WL 2190881, at *2 (W.D. Wash. June 14, 2012) (administrative filings)).

Decl. ¶ 20.  PPC alleges that the modification in the operations would reduce the amount of

power produced at the Detroit Project during the months in which it is implemented.  Am.

Compl. ¶ 58.  However, as PPC itself has emphasized, the Detroit Project produces "minimal

power without valuable operational flexibility at a cost many times higher than other hydro

projects" from which PPC's members obtain their power.  Jan. 5, 2021 Opinion-Editorial (linked

to in Am. Compl. ¶ 12), attached hereto as Ex. D.  The Corps commenced operating Interim

Measure No. 5 in November 2020, *id.* ¶ 54.[2]

### B.    Hydropower from the FCRPS

PPC's primary asserted interest in this case arises from its members' purchase of

electricity created by hydropower from federal dams in the Pacific Northwest.  The WVP

(including the Detroit Project) is part of an even larger federal system, the Federal Columbia

River Power System ("FCRPS"), which is the "world's largest hydropower system."  Am.

Compl., ¶ 7; *Aluminum Co. of Am. v. Adminstr., Bonneville Power Admin*., 175 F.3d 1156, 1158

(9th Cir. 1999).  The FCRPS is comprised of the eight WVP projects that produce hydropower,

as well as twenty-three dams on the Columbia, Snake, and Rogue rivers (and their tributaries).

Am. Compl. ¶ 7; Ex. E, Excerpt of Brochure: Federal Columbia River Power System.[3]  Power

produced from these thirty-one dams comprising the FCRPS is marketed throughout the Pacific

Northwest by the Bonneville Power Administration ("BPA").  *ALCOA*, 175 F.3d at 1158.  PPC

is a trade association of consumer-owned utilities that have "a statutory preference" to purchase

power generated by the FCRPS and marketed by BPA.  Am. Compl. ¶¶ 7-8.

---

[2] As described in the June 18 Letter, the Corps proposed to not operate the turbines between 6:00
a.m. - 10:00 a.m. and 6:00 p.m. - 10:00 p.m. except for station service power (which provides
power inside the powerhouse).  June 18 Letter.
[3] The full brochure is available at
https://www.bpa.gov/p/Generation/Hydro/hydro/fcrps_brochure_17x11.pdf.

BPA sets rates that it charges for power, including to entities such as PPC's members, through a complicated statutory process governed by the Northwest Power Act ("NWPA"). 16 U.S.C. § 839e(i); *see also Pac. Nw. Generating Co-op. v. Dep't of Energy* ("*PNW Generating Co-op*"), 580 F.3d 792, 802 (9th Cir. 2009) (citing 16 U.S.C. § 839e(a)(1)). Section 7(a)(1) of the NWPA directs BPA's Administrator to periodically review and revise rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. 16 U.S.C. § 839e(a)(1). The Administrator has broad discretion to interpret and implement statutory directives applicable to ratemaking, especially with respect to adopting rate design methodologies or theories. *See Pac. Power & Light Co. v. Duncan*, 499 F. Supp. 672 (D. Or. 1980); *accord City of Santa Clara, Cal v. Andrus*, 572 F.2d 660, 668 (9th Cir. 1978) ("most widespread use" standard is so broad as to permit "the exercise of the widest administrative discretion"). Ultimately, the Administrator is to set rates, "in accordance with sound business principles, to recover the costs associated with the acquisition, conservation, and transmission of electric power" that is created by the FCRPS. 16 U.S.C. § 839e(a)(1).[4]

In December 2020, BPA issued a notice announcing initiation of its next administrative proceeding (or "rate case") to establish power rates for the FCRPS (as well as rates for

---

[4] Other factors are also relevant. Section 7(a)(1) of the NWPA provides that other statutory guidance is relevant to BPA's rate-setting, including Section 5 of the Flood Control Act of 1944's direction to "transmit and dispose of electric power and energy in such manner as to encourage the most widespread use of power at the lowest possible rates to consumers consistent with sound business principles," 16 U.S.C. § 839e(a)(1); 16 U.S.C. § 825s; and Section 9 of the Federal Columbia River Transmission System Act of 1974's direction that rates shall be established: (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles; (2) with regard to the recovery of the cost of producing and transmitting electric power, including amortization of the capital investment allocated to power over a reasonable period of years; and (3) at levels that produce such additional revenues as may be required to pay, when due, the principal, premiums, discounts, expenses, and interest in connection with bonds issued under the Transmission System Act. 18 U.S.C. § 838(g).

transmission, and ancillary and control area services).  BPA, Fiscal Year 2022-2023 Proposed

Power and Transmission Rate Adjustments, 85 Fed. Reg. 77,189-77,198 (Dec. 1, 2020).  The

current rates are set through September 30, 2021, so the new proceeding will set rates for

October 1, 2021 through September 30, 2023.  *Id.*  The initial step in the rate case was BPA's

disclosure of its proposed rates (which occurred on December 7, 2020).  As part of its analysis of

these proposed rates, BPA proposed that the average rate for a customer purchasing at "Priority

Firm" (or "PF") Tier 1 rates (which is the rate paid by PPC's members) would be no different

from the previous rate period from 2020-21.  *Id.* at 77,194.

Following disclosure of the proposed rates, the rate case then proceeds through a

contested administrative adjudication (including intervention by interested parties, quasi-

discovery proceedings, introduction of evidence from intervenors, cross-examination of BPA

employees, merits briefing, and oral argument).  *Id.* at 77,190.  The process is scheduled to

culminate with a Record of Decision in July 2021.  *Id.*

Preceding its proposed rates, announced in December, BPA invited public review of its

projected program costs and spending levels primarily through its separate Integrated Program

Review ("IPR") process.  *Id.* at 77190.  The IPR processes concluded with issuance on

September 30, 2020 of a final Close Out Report, which informs the public the expense and

capital level estimates, i.e., costs BPA's proposed rates will be set to recover.  *Id.*

PPC is a regular participant in BPA's rate-making processes.  It provided comments in

the IPR; in fact, it reported in its 2020 Annual Report that "[c]onsistent with PPC's advocacy,

BPA's final Integrated Program Review decisions held program expenses below inflationary

levels.  Notably, this includes holding Power Service's program expenses flat for the upcoming

rate period, meaning four years without any increase."  PPC 2020 Annual Report, excerpts

attached hereto as Ex. F.

C.    PPC's Claims in this Litigation

On January 8, 2021, PPC filed this case challenging the Corps' implementation of

Interim Measure No. 5, alleging potential impacts to the power rates that its members will pay.

PPC asserts three claims: (1) Interim Measure No. 5 violates the Flood Control Acts of 1938,

1948, and 1950 because of its impact on hydropower production at Detroit Dam; (2) the Corps

acted arbitrarily and capriciously, without reference to any substantive statute, in violation of the

APA; and (3) the Corps violated NEPA by failing to evaluate the potential environmental effects

of Interim Measure No 5.  Am. Compl. ¶¶ 61-77.  PPC seeks, among other relief, declaratory

relief and an injunction enjoining the Corps from implementing it or similar measures.  *Id.* at pp.

34-35.  PPC asserts injury on four bases: "substantially impaired access to power; economic

injuries; improperly adopted and legally invalid [conservation measures];" and injury to "PPC's

opportunity and rights to participate in the decision-making and analytical process for Interim

Measure No. 5."  *Id.* ¶ 14.

**STANDARD OF REVIEW**

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1),

the plaintiff bears the burden of establishing that the court has jurisdiction.  *Chandler v. State

Farm Mut. Auto. Ins. Co*., 598 F.3d 1115, 1122 (9th Cir. 2010).  A challenge to jurisdiction

under Rule 12(b)(1) may be facial or factual.  *Meyer*, 373 F.3d at 1039 (citing *White v. Lee*, 227

F.3d 1214, 1242 (9th Cir. 2000)).  In resolving a facial challenge under Rule 12(b)(1), the court

"must accept as true all material allegations of the complaint and must construe the complaint in

favor of the complaining party."  *Maya v. Centex Corp*., 658 F.3d 1060, 1068 (9th Cir. 2011)

(quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  However, "[b]ecause subject-matter jurisdiction focuses on a court's power to hear a plaintiff's claim, a court resolving a motion to dismiss under Rule 12(b)(1) must give factual allegations closer scrutiny than required for a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim." *CAlifornians for Renewable Energy v. Cal. Pub. Utilities Comm'n*, No. 08-cv-1954- JL, 2009 WL 10700582, at *2 (N.D. Cal. Feb. 10, 2009), *aff'd* 401 Fed. Appx. 238 (9th Cir. 2010) (citing *Lipsman v Sec'y of the Army*, 257 F.Supp.2d 3 (D.D.C. 2003)).  In contrast, in a factual attack, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Meyer*, 373 F.3d at 1039.  In such circumstances, the Court may properly review evidence beyond the complaint.  *Id.*

On a Rule 12(b)(6) motion for failure to state a claim, the Court must assess whether the complaint alleges sufficient facts that, if accepted as true, state an entitlement to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although the Court must accept the facts pleaded as true, legal assertions devoid of factual support are not entitled to this assumption.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  A complaint that presents merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  In determining whether a complaint states a claim, the court may also consider "documents incorporated by reference in the complaint, or matters of judicial notice." *Ritchie*, 342 F.3d at 907–08.

## ARGUMENT

PPC fails to allege an actual and imminent injury resulting from implementation of Interim Measure No. 5, or one that might be redressable by this Court.  It therefore fails to invoke the jurisdiction of this Court as to all its claims.  But even if it had, PPC's second claim—

a "stand alone" claim under the APA—is precluded under Ninth Circuit precedent.  Finally, the Court should dismiss PPC's third claim, alleging a NEPA violation, because the only conceivable injury PPC alleges is purely economic, and PPC therefore falls outside of NEPA's zone of interests.

## I.    Plaintiff's Failure to Adequately Allege Standing Deprives this Court of Jurisdiction

Consistent with Article III's case-or-controversy requirement, a plaintiff must establish that it has standing to sue.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To do so, a plaintiff must show: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  When, as here, standing is addressed at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration in original).

PPC fails to allege facts that demonstrate it has standing.  PPC alleges no direct harm to it as an organization.  Rather, PPC's primary claimed injury ostensibly arises from concerns that Interim Measure No. 5 may increase the rates that its members pay for power from the FCRPS.  But PPC does not allege that this is already happening, and it fails to allege any facts demonstrating that a rate increase as a result of Interim Measure No. 5 is imminent or even likely.  Nor does it demonstrate how such injury—even if plausible—is redressable by this Court.  Furthermore, its vaguely asserted interest in avoiding "improperly adopted and legally invalid fish conservation and riverine, aquatic, and riparian habitat restoration measures" fails to identify any concrete injury to its members.  *See* Am. Compl. ¶ 14.  The Amended Complaint should be dismissed.

### A.     PPC has not alleged an actual injury to itself as an organization

As an initial matter, PPC indicates that it asserts standing, in part, based on direct injury to itself as an organization. *See* Am. Compl. ¶ 14 (alleging that both PPC and its members "have legally cognizable interests that have been, and will continue to be, adversely affected . . ."). However, PPC alleges no facts that would support standing on that basis.

An organization can assert standing based on an alleged injury to itself. Specifically, an "organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); s*ee also Am. Diabetes Ass'n v. U.S. Dept. of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) ("an organization may establish 'injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question,'" (quoting *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004))).

PPC alleges no facts that could support a finding of organizational standing. It fails to even identify its mission, let alone allege how its mission has been frustrated by implementation of Interim Measure No. 5. *See* Am. Compl. ¶ 7.[5]  Nor does PPC allege a cognizable diversion of its resources. *See id.* ¶¶ 7-14. Initiating a lawsuit cannot itself suffice to demonstrate such diversion. *See La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 (an organization cannot "manufacture the injury by incurring litigation costs"). As such, PPC's complaint provides no allegations of injury to PPC as an organization, and therefore it cannot assert standing on that basis. *See id.*

---

[5] PPC's mission statement is "to preserve and enhance the benefits of the Federal Columbia River Power System for consumer-owned utilities." Ann. Rep. at 7.

DEFENDANT'S MOTION TO DISMISS      11

**B.    PPC has not alleged a factual basis for associational standing for its asserted economic injury**

Alternatively, an organization can establish standing where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Diabetes Assoc.*, 938 F.3d at 1155 (quoting *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000)).  For the first element, PPC must establish that a member or members would have standing in their own right—namely that they "have suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical, ... the injury is fairly traceable to the challenged action of the defendant; and ... it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Ecological Rts. Found.*, 230 F.3d at 1147 (internal quotation omitted).  PPC fails to make this showing.

       1.    <u>PPC does not establish an actual injury to its members with respect to economic injuries.</u>

PPC fails on the first prong of the requisite standing analysis with respect to its claimed economic injuries because it fails to assert any actual and imminent injury to its members.  At most, PPC implies that—at some point in the future—its members *may* end up paying higher rates for power.  Such a vague, speculative allegation of potential injury is insufficient to invoke the Court's jurisdiction.

PPC primarily alleges that implementation of Interim Measure No. 5 could cause injury to its members resulting from higher rates for power produced by the FCRPS.  *See* Am. Compl. ¶ 8 (alleging generally that PPC's members "end up paying, through higher power rates, for fish and wildlife measures that the Corps adopts or implements at any FCRPS facilities . . ."); ¶ 9

(alleging that "the less power that is produced at Detroit Dam, the more it costs PPC's members per megawatt hour to purchase the output that it does produce."). In general, "economic injury," including the imposition of higher rates by BPA on a consumer, could constitute actual injury for purposes of Article III. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013); *see also Nw. Requirements Utilities v. F.E.R.C.*, 798 F.3d 796, 805 (9th Cir. 2015) (financial harm in the form of increased prices can constitute concrete and particularized injury).

However, PPC does not allege current injury: it does not allege that its members are *already* paying higher rates increased rates as a result of the Corps' implementation of Interim Measure No. 5. Am. Compl. ¶¶ 7-9. Instead, reading its amended complaint generously, PPC implies that its members *may* pay higher rates *at some point in the future. See id.* But a plaintiff relying on future injury for its standing must meet a demanding burden. PPC's "'threatened injury must be *certainly impending* to constitute injury in fact'" and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) ("A plaintiff threatened with future injury has standing to sue 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Moreover, because PPC seeks injunctive relief as to Interim Measure No. 5, it must show "a very significant possibility of future harm." *Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013) (quoting *Mortensen v. Cnty. of Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004)).

PPC fails to make any allegations that support a substantial risk of future harm, let alone a "very significant possibility" of such harm. *See id*. In fact, PPC fails to make any factual

allegations indicating when, or through what mechanism, its members are likely to pay higher

rates because of Interim Measure No. 5.  Devoid of any alleged facts, PPC's Amended

Complaint is silent on how minor changes in operations of one project for limited hours over

three months translates into an "impending" or "a substantial risk" of economic harm from the

rates paid for by PPC's members.

Moreover, even if the economic harm could be calculated, it is speculative whether that

harm would actually affect the rates PPC members pay.  PPC presumes that reductions in

generation at the Detroit Dam and alleged increased fish mitigation costs will, perforce, be

passed through by BPA by increasing power rates charged to PPC's members at some point.

That, however, is far from certain.  There are multiple, intervening steps—including a statutory

administrative proceeding—that occur between the application of Interim Measure No. 5 and the

setting of rates by BPA.  In any one of these steps, any alleged impacts of Interim Measure No. 5

could be absorbed or otherwise nullified resulting in no economic harm to PPC and its members.

For example, the BPA Administrator could decide to absorb any projected cost increases

resulting from Interim Measure No. 5 by reducing other program spending or making other cost

adjustments.  *See, e.g., Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 789 (9th Cir.

2012) (noting that "Congress has delegated to BPA the discretion to determine 'how best to

further BPA's business interests consistent with its public mission'") (quoting *APAC. v.

Bonneville Power Admin.*, 126 F.3d 1158, 1171 (9th Cir. 1997)).  In this instance, PPC's

members' rates would be protected from any economic harm from Interim Measure No. 5 by

BPA's actions.  Considering PPC's stated ability to successfully convince BPA to hold "program

expenses below inflationary levels," it is entirely possible that the alleged economic harm could

be eliminated through the normal iterative processes BPA engages with its customers when

DEFENDANT'S MOTION TO DISMISS        14

developing its rates.  *See* Ex. F at 4. *Compare with Nw. Requirements Utilities*, 798 F.3d at 803, 805 (finding substantial risk of increased rates where BPA had *already* adopted a program under which it would provide compensation to certain generators, and had expressly stated in its decision adopting the program that the increased costs resulting from it "would be recovered from power customers") (internal quotation omitted).

Finally, PPC cannot base its standing on any claimed injury due to its allegation that Interim Measure No. 5 has and will "substantially reduce the quantity of available power to PPC's members."  Am. Compl. ¶ 9.  This allegation does not establish any concrete injury to its members.  Indeed, PPC's members do not purchase power specifically produced by the Detroit Project—rather, they purchase power produced by the FCRPS (which includes 30 additional dams).  *See id.* ¶ 7; Ex. E.  Moreover, PPC itself has emphasized that Detroit Dam produced "minimal power" compared to other FCRPS dams.  Ex. D.  Not surprisingly, then, PPC makes no allegations that, for instance, its members did not receive power when they needed it; that they had to obtain power from other, somehow less-favorable, sources; or any other particularized factual allegations of past or future injury resulting from the alleged reduced availability of power.  *See id.*  As such, this new allegation in the Amended Complaint cannot cure the defects to PPC's assertion of economic injury.

　　　　　　2.　　　PPC fails to allege facts demonstrating causation for economic injury.

Even if PPC had plausibly alleged that its members would face economic injury by paying higher rates for power from the FCRPS in the future, it fails to adequately allege that such injury would be caused by Interim Measure No. 5.  To successfully assert standing, PPC "must establish a 'line of causation' between defendants' actions and their alleged harm that is more

than 'attenuated.'"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011).  However, as described above, BPA's rate-setting process is a complicated, adversarial process.

Determinations made during the processes will ultimately be reached following consideration of a variety of factors and circumstances—related not just to operations at Detroit Dam—but related to the entire FCRPS.  Moreover, there are many intervening events, such as decisions by the BPA Administrator on reductions in spending levels, which could determine whether any economic impacts of Interim Measure No. 5 are passed along as increases to PPC members' rates.  PPC has not alleged facts demonstrating that the Corps' implementation of Interim Measure No. 5 will have a "determinative effect" on the rates that PPC's members may pay in the future.  *See Nw. Requirements Utilities,* 798 F.3d at 806.

Ultimately, any allegation that Interim Measure No. 5—a measure implemented temporarily for only part of the day, for a quarter of the year, on only one of the thirty-one dams in the FCRPS—will necessarily result in PPC's members paying a higher rate requires PPC to make *some* attempt to provide a factual basis for the multiple inferences.  *Wa. Envtl. Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013) ("where the causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, . . .the causal chain is too weak to support standing.") (quoting *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012)).  PPC does not even try to make such a factual showing, and its assertion of standing accordingly fails for lack of causation as well.

           3.    <u>PPC fails to allege that its alleged injury could be redressed by the Court</u>

PPC also fails to demonstrate that a favorable order in this matter will redress its alleged injury.  PPC's alleged injury presents a case of "third party causation;" ultimately, PPC is seeking to change the Corps' behavior "only as a means to alter the conduct of a third party, not

before the court, who is the direct source" of its alleged, future injury.  *See Pritikin v. Dep't of Energy*, 254 F.3d 791, 799–800 (9th Cir. 2001) (citing *Common Cause v. Dep't of Energy*, 702 F.2d 245, 254 (D.C. Cir. 1983)).  In other words, PPC's ultimate injury would only be addressed by a remedy that ensures that BPA (rather than the Corps) will not, at some point, increase the rates PPC's members pay for power from the FCRPS.

The Court cannot issue an order that will ensure such relief.  Fundamentally, PPC has not adequately alleged that its members necessarily will pay increased rates.  Furthermore, any increased rates that PPC's members may pay in the future will be the result of BPA's rate-setting process, an adversarial proceeding in which numerous factors and circumstances will be at play. Even if PPC had alleged facts that PPC's members would necessarily pay higher rates in the future—including as a result of Interim Measure No. 5 being implemented—its alleged injury would still not be redressable in this case.  As the Ninth Circuit has made clear, a party cannot establish standing when redressing its alleged injury would require the Court to compel conduct by a nonparty federal agency, even if such conduct is governed by "a statutory duty."  *Pritikin*, 254 F.3d at 801.  Thus, for instance, in *Pritikin,* a plaintiff did not have standing to assert a claim against the Department of Energy for failing to provide funding for another agency, the Agency for Toxic Substances and Disease Registry ("ATSDR"), to undertake statutorily-mandated health-monitoring activities at a Superfund site because even if it had, the ATSDR still might not act as the plaintiff wanted.  *See id.* (noting that ATSDR "could choose to ignore its statutory duty").  *Id.*  So too here.  Ultimately, the rates that PPC's members will pay in the future will be independently determined by BPA—not the Corps—and the Court cannot issue an order in this case that would ensure that BPA not increase power rates.  Stated differently, PPC has not demonstrated "a substantial likelihood" that an order preventing the Corps from continuing to

implement Interim Measure No. 5 "would be more favorable to [PPC or its members]," because it would result in them paying less for power.  *See Nw. Requirements Utilities*, 798 F.3d at 805. PPC has accordingly failed to allege that its alleged economic injury is redressable.

### C.    *PPC Fails to Adequately Allege Non-Economic Injury*

PPC also bases its associational standing on allegations that Interim Measure No. 5 adversely effects an elusive, putatively non-economic interest, namely one related to "the adoption of measures at Detroit Dam designed to benefit and avoid jeopardizing listed fish species that will also not flout or be inconsistent with another statutorily authorized purpose of the dam, power production."  Am. Compl. ¶ 10; *see also id.* ¶ 14 (alleging harm from "improperly adopted and legally invalid fish conservation and riverine, aquatic, and riparian habitat restoration measures" that are counterproductive).  PPC does not clearly define the contours of this alleged interest—but regardless, it does not allege cognizable injury to the interest.  Nor, to the extent this injury is to alleged environmental interests, are such interests germane to PPC's organizational purposes.

### 1.    PPC does not allege an actual injury to its members.

As with its asserted economic injury, PPC fails to allege facts demonstrating actual injury to its members for its purported non-economic injury.

As an initial matter, this claimed injury appears to arise from the same concerns as its alleged economic injury, namely potential impacts to the rates its members pay for power from the FCRPS.  PPC's allegations show that any interest in the "full recovery and ultimate delisting under the ESA of the listed fish species affected by the Dam" is linked to its desire to reduce costs for mitigation of the FCRPS's environmental impacts. Am. Compl. ¶ 10 (noting "vital interest" arises in large part from desire to reduce "fish and wildlife costs, and, in turn, power

rates for their customers"); *id.* (interest in adoption of those measures at "Detroit Dam designed to benefit and avoid jeopardizing listed fish species . . . which are the most cost-effective means of doing so given that [PPC's members] bear such a large burden of the costs of such measures"); *id.* ¶ 10 (noting that "although PPC and its members support fish conservation and aquatic and riparian habitat restoration, they also wish to ensure that  . . cost-effective and legally valid alternatives are fully vetted, considered, and have the environmental and economic effects properly analyzed"); *id.* ¶ 12 (alleging that alleged water temperature effects "which will not be able to be wholly avoided or mitigated in real time, and therefore are likely to result in greater and long-term needs for PPC's members to pay for the mitigation of such adverse effects in the future.").[6]  Thus, PPC's asserted injury related to "improperly adopted and legally invalid fish conservation and . . . habitat restoration measures" is actually an interest in not having its power rates not increased now or in the future as a result of Interim Measure No. 5.  But as discussed above, PPC fails to allege that Interim Measure No. 5 has already increased the rates for power that its members pay or make non-speculative allegations that they will in the future.

---

[6]An Op-ed co-written by PPC's executive director (noted above) corroborates that economics are PPC's focus.  *See* Am. Compl. ¶ 12; Ex. D.  Therein, PPC's executive director opines that Detroit and two other projects should be decommissioned for power purposes, focusing on purely economic issues:

> Representing the community-owned customers of the Bonneville Power Administration that purchase the output of these dams, the Public Power Council's analysis determines that these projects are *uneconomic* – producing minimal power without valuable operational flexibility at a cost many times higher than other hydro projects in the Federal Columbia River Power System. Deauthorizing the power aspect at these projects will save consumers millions of dollars.

Ex. D.  Similarly, PPC's mission statement, as discussed below, includes nary a mention of the promotion of environmental interests.

Next, even if distinct from its asserted economic injury, PPC identifies no other concrete injury in fact to its members.  PPC alleges a broad interest in the adoption of measures that will benefit listed species while not "flout[ing] another statutorily authorized purpose."  *See* Am. Compl. ¶ 10.  However, any generalized interest in ensuring that the Corps complies with its various statutory obligations cannot support PPC's standing.  *See Hells Canyon Pres. Council v. U.S. Forest Serv*., 593 F.3d 923, 930 (9th Cir. 2010) ("plaintiffs' general displeasure with the Forest Service's failure to comply with its statutory duties," and "their desire to see the Nation's laws . . . faithfully enforced" is not enough to establish injury under Article III.") (internal quotations omitted).

Furthermore, to the extent PPC relies on poorly defined "environmental interests" held by its members, such reliance is also unwarranted.  Am. Compl. ¶ 12.  Allegations of "generalized harm to . . . the environment will not alone support standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).  *See also See Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) ("a plaintiff normally does not have standing where the only 'asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens.'") (quoting *Seldin*, 422 U.S. at 499).  Thus, any alleged environmental harm must be tied specifically to the interests of the plaintiff or its members.  *Ecological Rts. Found*, 230 F.3d at 1147 ("The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that interest is impaired by a defendant's conduct." ); *Demoruelle v. Kucharski*, 19-cv-00269-JAO-RT, 2019 WL 4739285, at *4 (D. Haw. Sept. 27, 2019) (dismissing complaint for failure to establish "connection to the area of concern sufficient to make credible the contention" of injury); *Animal Leg. Def. Fund v. Bernhardt*, 19-CV-06812-JST, 2020 WL 6802838, at *4 (N.D.

Cal. May 18, 2020) (allegations that members "frequent natural areas for the purposes of observing threatened and endangered species and other recreational and professional pursuits" insufficient to establish standing to challenge promulgation of rule under the ESA).

Under these authorities, PPC fails to allege a basis for environmental injury to its members.  PPC alleges that its members have "publicly declared their commitment to environmentally-friendly and sustainable power generation and usage."  Am. Compl. ¶ 10.  This broad-based interest in "preventing harm to the environment" is insufficient.  *See Summers.* 555 U.S. at 494.  Moreover, even if the allegation could be narrowed to allege an interest in the preservation of listed salmonid species, it would still be insufficient.  *See Ctr. for Envtl. Sci. Accuracy & Reliability v. Nat'l Park Serv.*, 14-cv-02063-LJO-MJS, 2016 WL 4524758, at *13 (E.D. Cal. Aug. 29, 2016) (finding that were plaintiff provided "no explanation of his purported interest in the species beyond stating in a conclusory manner that he is committed to protecting them," his vague, unspecific interest is insufficient to establish an injury in fact).

Furthermore, PPC fails to allege how Interim Measure No. 5 might harm the environment in detriment to its members' interests.  Interim Measure No. 5 was implemented by the Corps, in consultation with NMFS, to *promote* listed salmonid survival—and PPC does not allege that it will not do so.  To be sure, PPC alleges that Interim Measure No. 5 "may result in unacceptable water temperature effects downstream," but it never alleges that such temperature effects will harm listed species or other natural resources in which a PPC member asserts a specific interest.[7]

---

[7] PPC's allegation regarding temperature impacts appears to derive from the Declaration of Sean Askelson filed in *NEDC v. Corps,* but misconstrues the import of his statements.  *See* Am. Compl. ¶¶ 12, 51.  Mr. Askelson was addressing effects from a similar measure proposed by the NEDC plaintiffs—but which differed from Interim Measure No. 5 because, *inter alia*, releases would necessarily be made *only* from the upper regulating outlets at the dam.  Askelson Decl., *NEDC v. Corps*, ECF No.132 ¶ 65, attached hereto as Ex. H.  Mr. Askelson's opinion had nothing to do with turbine operation—which itself has no impact whatsoever on water

Indeed, PPC fails to allege any particularized interest by its members in the stretch of the river below Detroit Dam.  *See Summers*, 555 U.S. at 448 ("[T]o establish standing plaintiffs must show that they use the area affected by the challenged activity and not an area roughly in the vicinity of a project site").  The only locations that PPC *does* connect to its members are either not described, or nowhere near Detroit Dam.  Am. Compl. ¶ 10 (alleging that one member "planted 51 acres of new climate adopted forest on land" purchased by Seattle, and another has competed "numerous restoration projects" on the Sultan River in Washington State").

In summary, PPC fails to allege a factual basis for its asserted non-economic injury, because it fails to allege any facts demonstrating a particularized injury to its members.[8]

## 2.    Environmental interests are not germane to PPC's purposes.

PPC also fails to demonstrate that advancing any specific environmental issue implicated in this litigation is germane to its organizational purposes.  *See Am. Diabetes Assoc.*, 938 F.3d at 1155.

As noted above, PPC's mission statement is "to preserve and enhance the benefits of the Federal Columbia River Power System for consumer-owned utilities."  Ann. Rep. at 7.  Its mission statement makes no mention of promoting environmental interests.  Further, it is clear that the "benefits" referred to in its mission statement relate to power production and economics. As PPC has explained:  "With our 'public power first' mission, PPC is focused on our members' power and transmission supply, costs, rates, and contracts."  *Id.* at 5; *see also id.* (noting "PPC's

---

temperature—and furthermore, Interim Measure No. 5 does *not* designate whether the turbine outlet or upper regulating outlet should be used for releases, allowing the Corps to adaptively manage temperature by mixing water of differing temperatures at different elevations.  *Id.* ¶¶ 51, 53, 54; June 12 Letter at 4-5.

[8] As with its economic injury, PPC cannot establish redressability either.  Even if PPC had adequately alleged an injury to listed salmonids, it fails to allege facts that circumstances would be more favorable for the listed salmonids if the Court vacated Interim Measure No. 5.  *See Nw. Requirements Utilities*, 798 F.3d at 805.

rigorous focus on economics and the proper allocation of costs").  When it focuses on fish and wildlife issues, PPC's focus appears to be on ensuring that its members not unfairly bear the cost of fish and wildlife mitigation issues.  PPC 2020 Comments on 2020 IPR at 4 (attached hereto as Ex. G) ("PPC supports scientifically based mitigation efforts that are effective from both a biological and cost perspective.  However, public power cannot continue to solely bear ever-increasing costs for programs that provide broad regional and social benefits.")

The germaneness test is, to be sure, "undemanding."  *See Presidio Golf Club v. Nat'l Park Serv*., 155 F.3d 1153, 1159 (9th Cir. 1998).  However, a plaintiff organization must make "a connection 'between the purported environmental interest' that the association is seeking to protect and the 'interests that [the association] is organized to protect.'"  *CA. Unions for Reliable Ener. v. U.S. Dept. of the Int*., 10-cv-9932-GW-SSX) 2011 WL 13116730, at *11 (C.D. Cal. June 13, 2011) quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric*., 415 F.3d 1078, 1104 (9th Cir. 2005)).  Here, PPC cannot reasonably assert that the vague environmental interests it alludes to are connected to the interests that it was organized to protect.  *See Ranchers Cattlemen Action*, 415 F.3d at 1104 (finding environmental interests asserted in NEPA claim were not connected to "the 'trade and marketing' interests [plaintiff] is organized to protect.").  PPC therefore cannot demonstrate that any environmental interests it alludes to are germane to its organizational purposes.

### D.    *PPC Fails to Allege Cognizable Procedural Injury*

Finally, PPC also asserts a "procedural injury," based on the "the Corps' failure to follow the requisite procedures imposed by each of the statutes under which PPC brings its claims."  Am. Compl. ¶ 13.  But because PPC fails to demonstrate an actual injury to its members' interest, this allegation fails to establish standing for PPC.

It is well established that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496; *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003) ("a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing"). To establish procedural injury, therefore, PPC must allege (1) the Corps violated certain procedural rules; (2) these rules protect PPC's concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests. *Citizens for Better Forestry*, 341 F.3d at 969–70.

PPC fails to do so. For its first and second claims, it fails to identify any mandatory procedural rule or rules designed to protect any threatened concrete interest of PPC or its members. *Id.* For instance, in its first claim, PPC alleges Interim Measure No. 5 is inconsistent with "the statutory purposes and mandates under which the [Detroit Project] was authorized," but makes no allegation that such statues impose procedural requirements that the Corps violated. Am. Compl. ¶¶ 68-70. Nor, with respect to its second claim, can PPC assert that the APA's broadly applicable procedural requirements are designed to protect any concrete interests asserted in this case.

Furthermore, PPC fails to meet the third prong of the *Citizens* test for all three claims. As discussed above, PPC has failed to demonstrate that Interim Measure No. 5 will threaten its asserted concrete interests. And with particular respect to its only procedural claim—its third claim, alleging a violation of NEPA—PPC does not allege any particularized interest in any natural resources that might be impacted by Interim Measure No. 5. *See Summers*, 555 U.S. at ("[T]o establish standing plaintiffs must show that they use the area affected by the challenged

activity and not an area roughly in the vicinity of a project site").  PPC's assertion of procedural standing fails.

## II.   PPC's Second Claim, Asserting a Stand-Alone APA Claim, Fails under Ninth Circuit Precedent

Even if PPC had established standing, its second claim should be dismissed under Rule 12(b)(6) for the additional reason that it has failed to allege that the Corps violated a substantive statute.  Specifically, PPC asserts that the Corps violated the APA—and the APA alone—by acting in an "arbitrary and capricious" manner.  Am. Compl. ¶¶ 68-71.  PPC alleges that the Corps' adoption of Interim Measure No. 5 was unlawful under the APA because the Corps failed to (1) consider all relevant factors; (2) adhere to its own "legal standard," as identified in an internal legal memorandum (which was an exhibit in the NEDC case); (3) adequately explain to the public its adoption of the measure; (4) comply with its "own internal direction" to deviate from prior operations; and (5) allow for comment by "those most directly affected by Interim Measure No 5."  *Id.* ¶ 70.  The problem with PPC's claim, however, is that it fails to allege that any of the Corps' allegedly "arbitrary and capricious" conduct violates the requirements of any substantive statute.  This is fatal to PPC's claim, because the Ninth Circuit does not recognize a stand-alone APA claim.

The APA provides a cause of action where a person has suffered a "legal wrong because of agency action, or [has been] adversely affected or aggrieved by agency action within the meaning of *a relevant statute* . . . ."  5 U.S.C. § 702 (emphasis added); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).  Absent a statute with substantive standards, judicial review is precluded because there is no "law to apply" and "no meaningful standard against which to judge the agency's exercise of discretion."  *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  Consequently, a

claim that fails to identify "a relevant statute" cannot qualify for the APA's private right of action. *El Rescate Legal Servs. Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 753 (9th Cir. 1991); *see also Backes v. Bernhardt*, 1:19-CV-00482-CL, 2020 WL 906313, at *3 (D. Or. Feb. 24, 2020) (rejecting stand-alone APA claim, because the APA "'do[es] not declare self-actuating substantive rights, but rather, . . . merely provide a vehicle for enforcing rights which are declared elsewhere.'") (quoting *Perales v. Casillas*, 903 F.2d 1043, 1050 n. 4 (5th Cir. 1990)); *Kaszycki v. United States*, C19-1943 RSM, 2020 WL 2838598, at *3 (W.D. Wash. June 1, 2020), appeal dismissed, 2020 WL 6395503 (9th Cir. Oct. 8, 2020) ("The right to judicial review under the APA belongs only to those who are "suffering legal wrong ... or adversely affected or aggrieved by agency action within the meaning of a relevant statute") (quoting 5 U.S.C. § 702).

PPC identifies no relevant statute under its Second Claim that it alleges the Corps violated.  At most, PPC alleges that the Corps acted inconsistently with its own legal opinions and internal guidance.  Am. Compl. ¶¶ 70(b) & (d).  However, such allegations do not allege a statutory violation, and cannot support a cognizable claim.  *See Backes,* 2020 WL 906313 at *3 ("While Plaintiffs cite to the internal BLM Manual and internal BLM policies requiring such delegation, there is no statute establishing a duty to delegate the signatory authority that would create a legal basis for the claim").

PPC's other allegations—namely that the Corps acted unlawfully by failing to consider all relevant factors, explain its adoption of the measure, and provide an opportunity for comment—fail for the same reason.  Am. Compl. ¶¶ 70 (a), (c) & (e).  PPC fails to identify any statute that provides particular factors that the Corps was required to consider or procedures that the Corps was required to follow.  *See Or. Nat. Res. Council*, 92 F.3d at 798 (stand-alone APA claim alleging that agency overlooked "an important aspect of the problem" could not stand,

because resolving such a claim "would necessarily turn on what a relevant substantive statute makes 'important'"); *Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 955 (9th Cir. 2017) ("[A]rbitrary and capricious review does not apply in the absence of a statutory benchmark against which to measure an agency's exercise of discretion."). Nor does PPC identify a statutory requirement to provide some unidentified group of persons with the opportunity to "be heard." Am. Compl. ¶ 70(e). PPC's Second Claim therefore, by failing to allege violation of a substantive statute, fails as a matter of law and should be dismissed.

### III.   PPC Does not Establish "Prudential Standing" for its NEPA Claim

PPC's third claim, alleging a violation of NEPA, should also be dismissed under Rule 12(b)(6). PPC's primary alleged harm—pure economic injury—does not fall within NEPA's zone of interests, and therefore the claim should be dismissed as being brought by an improper party under the doctrine of "prudential standing."

A plaintiff seeking to enforce a statutory duty must "fall within the 'zone of interests' protected by the statute in question to bring their claims in federal court." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020) (quoting *Lexmark Int'l, Inc., v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014)). Under the APA, the test is not "especially demanding, but does foreclose suit 'when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue.'" *Id.* (quoting *Lexmark Int'l,* 572 U.S. at 129).

"NEPA is directed at environmental concerns, not business concerns." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005). As a result, it is well-established in the Ninth Circuit that when a plaintiff asserts injury to purely economic interests, its claim falls outside of NEPA's zone of interests. *See id* at 940; *Cachil Dehe Band of Wintun Indians of*

*Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 606 (9th Cir. 2018) ("we have 'consistently held that purely economic interests do not fall within NEPA's zone of interests'") (quoting *Ashley Creek Phosphate*, 420 F.3d at 940); *Ranchers Cattlemen Action*, 415 F.3d at 1103 ("to assert a claim under NEPA, a plaintiff must allege injury to the environment; economic injury will not suffice"); *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *United States v. W. Radio Servs. Co.*, 869 F. Supp. 2d 1282, 1284 (D. Or. 2012), aff'd sub nom. *Oberdorfer v. Jewkes*, 583 Fed. App'x 770 (9th Cir. 2014) (telecomm company challenging Forest Service's approval of a special use permit for competitor to construct radio communication towers asserted only economic harm, and therefore fell outside of NEPA's zone of interests).

PPC primarily asserts economic harm to its members. *See* Am. Compl. ¶ 8 (alleging injury because "PPC members end up paying, through higher power rates, for fish and wildlife measures that the Corps adopts or implements at an FCRPS facilities"); ¶ 9 (alleging injury due to PPC's members paying more per megawatt hour). These interests indisputably fall outside NEPA's zone of interests. *Ashley Creek Phosphate*, 420 F.3d at 940.

While, as discussed above, PPC asserts a putative non-economic interest, this assertion does not bring it within NEPA's zone of interests either because PPC asserts no concrete injury tied to environmental harm. Notably, the measure being challenged by PPC is being implemented solely to *promote* the survival of listed species—and PPC makes no allegation that it will not do so. Furthermore, any such generic interest in anadromous fish survival is not tied to PPC's organizational purposes, and thus is not adequately differentiated from the interests of the general public. *W. Radio Servs. Co.*, 869 F. Supp. 2d at 1286. And, again as discussed

above, PPC identifies no particularized environmental interest that may be impacted by Interim

Measure No. 5.  See *Summers*, 555 U.S. at 446.  As a result, PPC does not fall within NEPA's

zone of interests, and its NEPA claim should be dismissed.

## CONCLUSION

PPC has failed to properly invoke the jurisdiction of this Court because it fails to allege

facts that demonstrate that it has standing to pursue its claims.  Even if PPC could demonstrate

standing, its second claim, asserting a "stand-alone" APA claim, fails to state a claim under well-

established Ninth Circuit precedent.  Furthermore, because it asserts only economic interest, it

does not fall within NEPA's zone of interests, and its third claim should be dismissed as well.

Respectfully submitted this 1st day of April, 2021.


JEAN E. WILLIAMS, Acting Assistant Attorney
General

*/s/ Romney S. Philpott*
ROMNEY PHILPOTT, Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1810 | Fax: (303) 844-1350
Email: Romney.Philpott@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 1, 2021, the foregoing was electronically filed with the Court's electronic filing system, which will generate automatic service upon all Parties enrolled to receive such notice.

*/s/ Romney S. Philpott*
Romney Philpott